and records falsely described as a "referral fee" to the Palm Springs Law Firm regarding <u>Schein Pharmaceutical</u>.

Overt Acts Nos. 106-107: On or about the following dates, LAZAR caused the proceeds of the check described in Overt Act No. 105 to be used to make the following payments and credits, among others, for his benefit:

| OVERT ACT | DATE | APPROXIMATE AMOUNT | RECIPIENT |
|-----------|------|--------------------|-----------|
| No. 106 | 12/29/00 | $ 23,000 | the Palm Springs Law Firm |
| No. 107 | 01/10/01 | $ 23,000 | the Selzer Law Firm |

Overt Act No. 108: On or about June 18, 2001, MILBERG WEISS and BERSHAD attempted to send to the Palm Springs Law Firm a $133,000 check with a cover letter signed by BERSHAD falsely stating that the payment represented "your share of the fee in recognition of your participation in the fee in [<u>Schein Pharmaceutical</u>]."

Overt Act No. 109: On or about July 9, 2001, MILBERG WEISS and BERSHAD caused to be sent to the Palm Springs Law Firm a $133,000 check, after the check described in Overt Act No. 108 had been returned to MILBERG WEISS because it was improperly addressed.

Overt Acts Nos. 110-112: On or about the following dates, LAZAR caused the proceeds of the check described in Overt Act No. 109 to be used to make the following payments and credits, among others, for his benefit:

| OVERT ACT | DATE | APPROXIMATE AMOUNT | RECIPIENT |
|-----------|------|--------------------|-----------|
| No. 110 | 07/11/01 | $ 95,795 | the Palm Springs Law Firm |
| No. 111 | 07/18/01 | $ 35,000 | the Selzer Law Firm |

| OVERT ACT | DATE | APPROXIMATE AMOUNT | RECIPIENT |
|-----------|------|--------------------|-----------|
| No. 112 | 08/16/01 | $ 3,895 | Lazar Intermediary B |

**B.    Overt Acts in the Vogel Lawsuits**

**The *Valero I* Class Action**

Overt Act No. 113: Prior to in or about August 1991, Partner E, acting in concert with BERSHAD, told Vogel that MILBERG WEISS would pay Vogel for serving as a named plaintiff in an action against Valero Energy Corporation.

Overt Act No. 114: On or about August 20, 1991, MILBERG WEISS, Partner E, and others caused to be filed with the court a class action complaint in Valero I, naming Vogel as a plaintiff, in which they falsely represented, among other things, that Vogel had "the same interests [in the outcome of the case] as the other members of the Class."

Overt Act No. 115: In or about mid-1992, BERSHAD and Partner E told Vogel that he needed to identify a lawyer through whom MILBERG WEISS would pay him, because MILBERG WEISS would not pay Vogel directly.

Overt Act No. 116: In or about mid-1992, following the discussion referenced in Overt Act No. 115, Vogel enlisted Vogel Intermediary A to receive monies from MILBERG WEISS on Vogel's behalf.

Overt Act No. 117: In or about mid-1992, during a meeting attended by, among others, BERSHAD, Partner E, and Vogel, BERSHAD told Vogel the following: (a) MILBERG WEISS would pay Vogel 14% of the attorneys' fees MILBERG WEISS obtained in Valero I; (b) MILBERG WEISS would also reimburse Vogel for losses that would be sustained by him in connection with the eventual

51

sale of his Valero securities; and (c) since Vogel had not yet sold his Valero securities, MILBERG WEISS would pay him $10,000 in anticipation of such losses.

Overt Act No. 118: On or about October 14, 1992, MILBERG WEISS and Partner E sent to Vogel Intermediary A a purported retainer agreement, which stated in part:

> This will confirm that we have been retained by Howard Vogel . . . to prosecute a class action [against] Valero Natural Gas Partners L.P., and a derivative action on behalf of the partnership. On the basis of your efforts in this matter and your having shared in the work and responsibility in this matter, we will pool all fees awarded to us and you shall receive 14% (fourteen percent) of the fees so awarded plus $10,000.

Overt Act No. 119: On or about October 16, 1992, MILBERG WEISS, Partner E, and others caused the court to certify Valero I as a class action, approve Vogel and his wife as class representatives, and preliminarily approve a proposed settlement of Valero I.

Overt Act No. 120: On or about November 23, 1992, MILBERG WEISS, Partner E, and others caused the court to award approximately $4.75 million in attorneys' fees and expenses in Valero I.

Overt Act No. 121: On or about December 28, 1992, MILBERG WEISS, Partner E, and others caused to be sent to Vogel Intermediary A a check in the amount of $637,223, representing Vogel's share of the attorneys' fees awarded in Valero I, plus an additional $10,000.

Overt Act No. 122: In or about January 1993, Vogel caused Vogel Intermediary A to transfer to Vogel substantially all of the proceeds of the check described in Overt Act No. 121.

1

## The *Valero II* Class Action

2     Overt Act No. 123: On or about October 15, 1993,
3 MILBERG WEISS, Partner E, and others caused to be filed with the
4 court a class action complaint in <u>Valero II</u>, naming Vogel as a
5 plaintiff, in which they falsely alleged, among other things,
6 that Vogel had "the same interests [in the outcome of the case]
7 as other members of the Class."

8     Overt Act No. 124: On or about March 13, 1994, after
9 Vogel sold his Valero securities at a $27,600 loss, Vogel sent to
10 MILBERG WEISS and Partner E a letter requesting that
11 MILBERG WEISS "add the sum of $17,600" to Vogel's expected
12 payment in <u>Valero II</u>, explaining that "[i]t was Dave Bershad's
13 position in late 1992 that since no loss was actually <u>incurred</u>, a
14 contribution to the unknown future loss would be $10,000," and
15 asserting that the remaining $17,600 loss was "real money – no
16 different than the out of pocket disbursements that your firm
17 incurs to maintain the case."

18     Overt Act No. 125: On or about May 23, 1994,
19 MILBERG WEISS, Partner E, and others caused Vogel to sign an
20 under-oath affidavit, to be filed with the court in support of a
21 proposed settlement of <u>Valero II</u>, in which Vogel falsely stated,
22 among other things, "I have no claim or interest of any kind [in
23 the outcome of the case] that is adverse to Valero Partners or
24 its public unitholders . . . nor do I have any conflict of
25 interest of any kind that precludes me from bringing or settling
26 this action."

27     Overt Act No. 126: On or about May 31, 1994, MILBERG
28 WEISS, Partner E, Vogel, and others caused the court to approve a

settlement in Valero II, and to award approximately $1.2 million in attorneys' fees and expenses.

Overt Act No. 127: On or about June 2, 1993, MILBERG WEISS, Partner E, and others caused to be telefaxed to Vogel Intermediary A a letter stating, "As Howard Vogel's referring attorney you will receive 14% of the legal fee that is paid to my firm, [MILBERG WEISS]."

Overt Act No. 128: On or about July 18, 1994, MILBERG WEISS, Partner E, and others caused to be sent to Vogel Intermediary A a check in the amount of $69,860.89, with a cover letter signed by Partner E falsely describing the payment as "your firm's referral fee" in Valero II.

Overt Act No. 129: On or about July 26, 1994, Vogel caused Vogel Intermediary A to wire transfer to Vogel approximately $69,848.39 of the proceeds of the check described in Overt Act No. 128.

### The *Oxford Health* Class Action

Overt Act No. 130: Prior to in or about October 1997, Vogel read a research report that contained negative financial analysis about Oxford Health Plans, Inc. ("Oxford Health").

Overt Act No. 131: On or about October 8, 1997, Vogel caused a trust of which he was the sole trustee (the "Howard Vogel Retirement Plan," hereinafter referred to as "HVRP") to purchase 50 shares of Oxford Health stock for the purpose of positioning HVRP to be a named plaintiff in a securities fraud class action lawsuit to be brought by MILBERG WEISS against Oxford Health.

/ / /

1

      Overt Act No. 132: On or about October 31, 1997,
MILBERG WEISS, Partner E, and others caused Vogel to sign under
penalty of perjury a certification, be filed with the court in
Oxford Health, in which Vogel falsely stated, among other things,
that HVRP did not purchase Oxford Health "in order to participate
in any private action arising under the federal securities laws,"
and would "not accept any payment for serving as a representative
party on behalf of a class beyond plaintiff's pro rata share of
any recovery, except such reasonable costs and expenses
(including lost wages) directly relating to the representation of
the Class as ordered or approved by the Court."

      Overt Act No. 133: On or about October 31, 1997,
MILBERG WEISS, Partner E, Vogel, and others caused to be filed
with the court a class action complaint in Oxford Health, naming
HVRP as a plaintiff, in which they falsely alleged, among other
things, that HVRP's claims were "typical of the claims of the
members of the Class."

      Overt Act No. 134: In or about November 1997, Partner E
told Vogel that because Oxford Health was so large, and
MILBERG WEISS would have other payment obligations in the case,
Vogel's  payment would be less than his usual percentage of
MILBERG WEISS's attorneys' fees.

      Overt Act No. 135: Sometime in or about 1999, Partner E
told VOGEL that he was leaving MILBERG WEISS, and that Vogel's
payment arrangements would thereafter be handled by SCHULMAN.

      Overt Act No. 136: On or about June 27, 2003,
MILBERG WEISS obtained approximately $40.0 million of the
attorneys' fees awarded in Oxford Health.

1

       Overt Act No. 137: In or about September 2003, SCHULMAN

2  told Vogel to have Vogel Intermediary A call Partner A to

3  negotiate the amount of Vogel's payment in Oxford Health and the

4  Baan class action (in which Vogel had arranged for his step-son

5  to serve as a named plaintiff for MILBERG WEISS).

6        Overt Act No. 138: On or about September 20, 2003,

7  Vogel sent SCHULMAN a memorandum stating, in part:

8     "As we discussed, enclosed is material from 1997/1998
       relating to my role as initiating plaintiff in the
9     Oxford and Baan cases. My dealings with [MILBERG
       WEISS] in those years centered around [Partner E].
10

11     My attorney, who previously represented me in the two
       Valero cases (working with [Partner E]) is [Vogel
       Intermediary A] . . . .
12

13     [Vogel Intermediary A] will call [secretary of Partner
       A] to arrange a call with [Partner A] to discuss the
14     Oxford case only."

15        Overt Act No. 139: On or about October 15, 2003, Vogel

16  sent, to Partner A's secretary, a copy of the memorandum

17  referenced in Overt Act No. 138, annotated to clarify that the

18  discussion with Partner A would include the Baan class action as

19  well as Oxford Health.

20        Overt Act No. 140: In or about October 2003, SCHULMAN

21  told Vogel that Partner A refused to engage in substantive

22  discussions with Vogel Intermediary A on the telephone, but

23  instead insisted on meeting Vogel Intermediary A in person at

24  MILBERG WEISS's offices in New York to discuss Vogel's payments

25  in Oxford Health and Baan.

26        Overt Act No. 141: On or about November 10, 2003,

27  Partner A met with Vogel Intermediary A at MILBERG WEISS's

28  New York offices and agreed that MILBERG WEISS would pay Vogel a

percentage of its attorneys' fees obtained in connection with

56

1

Oxford Health and Baan.

2          Overt Act No. 142: On or about December 18, 2003,
3 MILBERG WEISS, SCHULMAN, Partner A, and others caused to be sent
4 to Vogel Intermediary A a $1.1 million check, with a cover letter
5 signed by SCHULMAN falsely stating, "Enclosed please find a check
6 in the amount of $1,100,000.00, reflecting your share of court
7 ordered attorneys' fees in consideration of your work, services
8 and joint representation of our clients in connection with
9 [Oxford Health]."

10         Overt Act No. 143:  On or about December 18, 2003,
11 MILBERG WEISS, SCHULMAN, Partner A, and others also caused to be
12 sent to Vogel Intermediary A a $120,000 check, with a cover
13 letter signed by SCHULMAN falsely stating, "Enclosed please find
14 a check in the amount of $120,000.00, reflecting your share of
15 court ordered attorneys' fees in consideration of your work,
16 services and joint representation of our clients in connection
17 with [Baan]."

18         Overt Act No. 144: On or about January 8, 2004, Vogel
19 caused Vogel Intermediary A to wire transfer approximately
20 $1,205,932.37 of the proceeds of the checks described in Overt
21 Acts Nos. 142 and 143 to a bank account controlled by Vogel.

22                **The *Infinity Brodcasting* Class Action**

23         Overt Act No. 145: On or about June 14, 2000, after
24 learning that Viacom, Inc. ("Viacom"), might attempt to acquire
25 the publicly held shares of Infinity Broadcasting Corp.
26 ("Infinity Broadcasting"), in which Viacom held a majority
27 interest, Vogel caused his wife to purchase 100 shares of
28 Infinity Broadcasting to position her to serve as a named

57

plaintiff in a potential "transaction case" to be brought against Infinity Broadcasting by MILBERG WEISS.

Overt Act No. 146: On or about June 14, 2000, Vogel wrote a letter to SCHULMAN stating, among other things, "As we just discussed, [Vogel's wife] owns shares of Infinity Broadcasting" and "I feel that a complaint should be drafted and ready to go."

Overt Act No. 147: On or about August 15, 2000, the same day that Viacom announced a proposed acquisition by merger of the publicly owned shares of Infinity Broadcasting, MILBERG WEISS, SCHULMAN, and others caused to be filed a class action complaint in Infinity Broadcasting, naming Vogel's wife as a plaintiff.

Overt Act No. 148: On or about August 23, 2001, during an under-oath deposition taken of him by an Infinity Broadcasting shareholder who objected to the proposed settlement of Infinity Broadcasting and the adequacy of Vogel's wife as a representative plaintiff, SCHULMAN falsely stated that no promises had been made to Vogel's wife "in the context of any benefit that she might receive that the class would not receive" in Infinity Broadcasting, and that he was "not . . . aware" of any such promises being made in "any other case."

Overt Act No. 149: On or about September 14, 2001, MILBERG WEISS, SCHULMAN, Vogel, and others caused Vogel's wife to sign an under-oath affidavit, to be filed with the court in support of a proposed settlement of Infinity Broadcasting, which falsely stated, among other things, "I have no claim or interest that is adverse to Infinity or its public shareholders."

58

1

      Overt Act No. 150: On or about October 29, 2001,
MILBERG WEISS, SCHULMAN, and others caused the court, among other
things, to certify Infinity Broadcasting as a class action; to
approve Vogel's wife and others as a class representative; to
approve MILBERG WEISS as class co-counsel; to approve the
proposed settlement in Infinity Broadcasting; and to award $2.5
million in attorneys' fees.

      Overt Act No. 151: On or about March 13, 2003, SCHULMAN
directed an employee in MILBERG WEISS's accounting department to
draft a check to Vogel Intermediary B for 12% of the attorneys'
fees MILBERG WEISS obtained in Infinity Broadcasting.

      Overt Act No. 152: On or about March 17, 2003,
MILBERG WEISS, SCHULMAN, Vogel, and others caused to be sent to
Vogel Intermediary B an $86,923 check, along with a cover letter
signed by SCHULMAN falsely disguising the check as a payment to
Vogel Intermediary B "in consideration of [Vogel Intermediary
B's] work, services, and joint representation of our clients" in
Infinity Broadcasting.

      Overt Act No. 153: On or about March 24, 2003, Vogel
caused Vogel Intermediary B to send to him most of the proceeds
from the check described in Overt Act No. 152 and from a
MILBERG WEISS payment that had been made in connection with
another Vogel Lawsuit.

### Other Overt Acts in the Vogel Lawsuits

      Overt Act No. 154: In or about 1996, during a meeting
at MILBERG WEISS's New York offices, Partner E handed to Vogel a
substantial amount of cash, which he had obtained from BERSHAD,
as a secret kickback to Vogel for causing his wife to serve as a

named plaintiff in <u>Mercer</u>.

     <u>Overt Act No. 155</u>: On or about July 21, 1998, Vogel, acting in concert with MILBERG WEISS and others, in an under-oath deposition taken in the Vogel Lawsuit <u>Howard Vogel, et al. v. Marvin A Pomerantz, et al.</u>, C.A. No. 14722 (later consolidated into <u>In re Gaylord Container Corp. Shareholders Litigation</u>, Consolidated Civil Action No. 14616 (Del. Chancery Ct.) ("<u>Gaylord Container</u>"), refused to answer questions he was asked concerning his income or sources of income.

     <u>Overt Act No. 156</u>: In or about early 2000, after Partner E had left MILBERG WEISS, SCHULMAN told Vogel that he would not receive 14% of MILBERG WEISS's attorneys' fees in future cases in which Vogel was a named plaintiff, and instead would receive no more than 12% of MILBERG WEISS's attorneys' fees.

     <u>Overt Act No. 157</u>: In or about early December 2000, MILBERG WEISS, BERSHAD, and SCHULMAN reaffirmed that Vogel would receive 12% of MILBERG WEISS' attorneys' fees in <u>Vastar</u> and thereafter caused to be sent to Vogel Intermediary B a check in the amount of $94,000, made payable to "[Vogel Intermediary B] IOLA."

     <u>Overt Act No. 158</u>: On or about December 12, 2000, Vogel caused Vogel Intermediary B to pay Vogel $93,000 of the proceeds of the check described in Overt Act No. 157.

     <u>Overt Act No. 159:</u> On or about March 15, 2003, Vogel sent to SCHULMAN an "inventory" of all "transaction cases" in which Vogel, his wife, or HVRP were prepared to serve as named plaintiffs.

Overt Act No. 160: In or about late 2002, Vogel asked SCHULMAN when he would receive his share of the attorneys' fees that had been awarded to MILBERG WEISS in Future Healthcare.

Overt Act No. 161: On or about March 21, 2003, MILBERG WEISS, SCHULMAN, and others caused to be sent to Vogel Intermediary B a check in the amount of $68,993.70, which was 12% of MILBERG WEISS's attorneys' fees in Future Healthcare.

Overt Act No. 162: On or about April 9, 2003, MILBERG WEISS, SCHULMAN, and others caused Vogel to sign a certification under penalty of perjury, to be filed with the court in the Vogel Lawsuit Howard Vogel v. CIT Group Inc., et al., 93-CV-2471-JES (United States District Court, Southern District of New York) ("CIT"), in which Vogel falsely stated, among other things, that he would "not accept any payment for serving as a representative party of behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

Overt Act No. 163: On or about April 16, 2003, Vogel caused Vogel Intermediary B to send him $67,993.70 of the proceeds of the check described in Overt Act No. 161.

Overt Act No. 164: On or about May 24, 2004, MILBERG WEISS, SCHULMAN, and others caused Vogel to sign a certification under penalty of perjury, to be filed with the court in the Vogel Lawsuit Howard Vogel v. The Bisys Group Inc., et al., 04-CV-4048-LTS (United States District Court, Southern District of New York ("Bisys"), in which Vogel falsely stated,

61

among other things, that he "did not acquire the BISYS Group, Inc. . . . stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws," and would "not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law."

Overt Act No. 165: On or about July 26, 2004, MILBERG WEISS, SCHULMAN, and others caused Vogel to sign a certification under penalty of perjury, to be filed with the court in the Vogel Lawsuit Howard Vogel v. KVH Industries Inc., et al., 04-CV-320-ML ("KVH"), in which Vogel falsely stated, among other things, that he would "not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law."

Overt Act No. 166: On or about September 23, 2004, MILBERG WEISS, SCHULMAN, and others caused Vogel to sign an under-oath affidavit, to be filed with the court in support of a proposed settlement of U.S. Oncology, falsely stating, among other things, "I have no claim or interest of any kind that is adverse to [U.S. Oncology] shareholders . . . nor do I have any conflict of interest of any kind that would preclude me from bringing and prosecuting [U.S. Oncology] as a class action."

1

     Overt Act No. 167: On or about February 27, 2005,
MILBERG WEISS, SCHULMAN, Vogel, and others caused Vogel's wife to
sign an under-oath affidavit, to be filed with the court in
support of a proposed settlement of BarnesandNoble.com, falsely
stating, among other things, "I have no claim or interest of any
kind that is adverse to [BarnesandNoble.com] shareholders . . .
nor do I have any conflict of interest of any kind that would
preclude me from bringing and prosecuting [BarnesandNobel.com] as
a class action."

     Overt Act No. 168: On or about May 19, 2005,
MILBERG WEISS, SCHULMAN, and others caused to be sent to Vogel
Intermediary A a check in the amount of $10,800.67, along with a
cover letter signed by SCHULMAN falsely stating that the check
was Vogel Intermediary A's "referral fees" in connection with
BarnesandNoble.com.

     Overt Act No. 169: On or about June 20, 2005, Vogel
caused Vogel Intermediary A to forward to an account controlled
by Vogel approximately $10,320.80 of the proceeds of the check
described in Overt Act No. 168.

     Overt Act No. 170: On or about September 13, 2005,
MILBERG WEISS, SCHULMAN, and others caused Vogel to sign on
behalf of HVRP an under-oath affidavit, to be filed with the
court in support of a proposed settlement of the Vogel Lawsuit
In re Fox Entertainment Group, Inc. Shareholders Litigation,
Consolidated Case No. 1033-N (Del. Chancery Ct.) ("Fox"), falsely
stating, among other things, "I have no claim or interest of any
kind that is adverse to [Fox Entertainment Group] shareholders .
. . nor do I have any conflict of interest of any kind that would

63

preclude me from bringing and prosecuting [Fox] as a class action."

### C.    Overt Acts in the Cooperman Lawsuits

### The *Newhall Land* Class Action

Overt Act No. 171: On or about April 19, 1988 MILBERG WEISS, Partner B, and others caused to be filed a verified derivative and class action complaint in Newhall Land, naming Cooperman and Cooperman Plaintiff 1 as plaintiffs, in which they represented that "Plaintiffs . . . do not have interests antagonistic to or in conflict with those they represent as class representatives."

Overt Act No. 172: Between in or about April and November 1988, Cooperman told Cooperman Plaintiff 1 that MILBERG WEISS would pay them a percentage of MILBERG WEISS's fee in Newhall Land.

Overt Act No. 173: On or about November 8, 1988, MILBERG WEISS, Partner B, and others caused the court to approve a settlement of Newhall Land, which provided for an attorneys' fees award in the amount of $1,797,891.70 plus interest.

Overt Act No. 174: In or about early 1989, Partner B told Cooperman and Cooperman Plaintiff 1 that they could receive approximately 5% to 10% of MILBERG WEISS's attorneys' fees in Newhall Land; that MILBERG WEISS would pay Cooperman and Cooperman Plaintiff 1 5% to 10% of MILBERG WEISS's attorneys' fees in future cases that they brought to the firm; and that Cooperman and Cooperman Plaintiff 1 should purchase stocks in companies in order to position them and MILBERG WEISS to file lawsuits in the future.

1

**Overt Act No. 175**:  In or about early 1989, Cooperman gave to Cooperman Plaintiff 1 a check that Cooperman Plaintiff 1 understood to be his share of the amount MILBERG WEISS paid to Cooperman in <u>Newhall Land</u>.

### The *Jan Bell* Class Action

**Overt Act No. 176**: On or about March 7, 1990, MILBERG WEISS and others caused to be filed a class action complaint in the <u>Jan Bell</u> lawsuit, naming Cooperman as a plaintiff.

**Overt Act No. 177**: On or about March 22, 1991, in an under oath deposition in <u>Jan Bell</u>, Cooperman falsely testified, among other things, that in other lawsuits in which he had been a named plaintiff for MILBERG WEISS he had never received any money other than his shareholder portion of the settlements, and that "whatever the court awards as compensation or a judgment," he would "collect [his] share based on how much stock [he] bought."

**Overt Act No. 178**: On or about July 21, 1992, MILBERG WEISS and BERSHAD caused to be sent to Cooperman Intermediary A a $19,363 check, with a cover letter that falsely stated that the payment was to Cooperman Intermediary A "in consideration of your consultation and referral of Dr. Cooperman to our firm."

**Overt Act No. 179**: In or about July 1992, Cooperman caused Cooperman Intermediary A to use the proceeds of the check described in Overt Act No. 178 to satisfy legal fees Cooperman owed to Cooperman Intermediary A.

/ / /

/ / /

65

1

### The *American Continental/Lincoln Savings* Class Action

2       Overt Act No. 180: On or about January 30, 1989, acting

3 in consultation with Partner B, Cooperman Plaintiff 1 purchased

4 100 shares of stock in American Continental Corporation for the

5 purpose of positioning MILBERG WEISS and himself to file a class

6 action lawsuit.

7       Overt Act No. 181: On or about April 24, 1989,

8 MILBERG WEISS, Partner B, and others caused to be filed a class

9 action complaint in American Continental/Lincoln Savings, naming

10 Cooperman Plaintiff 1 as a plaintiff.

11       Overt Act No. 182: On or about October 12, 1989,

12 MILBERG WEISS, Partner B, and others caused to be falsely

13 represented to the court in support of a motion for class

14 certification in American Continental/Lincoln Savings, among

15 other things, that the interests of Cooperman Plaintiff 1 "do not

16 in any manner conflict with, nor are they antagonistic to, those

17 of the class."

18       Overt Act No. 183: On or about November 2, 1989,

19 Cooperman Plaintiff 1, acting in concert with MILBERG WEISS,

20 Partner B, and others, subscribed under penalty of perjury to

21 Answers to Interrogatories in American Continental/Lincoln

22 Savings, which falsely concealed that Partner B had discussed

23 with Cooperman Plaintiff 1 purchasing ACC stock to position

24 MILBERG WEISS to file a lawsuit.

25       Overt Act No. 184: On or about April 22, 1991, in an

26 under oath deposition in American Continental/Lincoln Savings,

27 Cooperman Plaintiff 1, acting in concert with MILBERG WEISS and

28 others, falsely stated, among other things, that he would not

1

receive any payment from any source in exchange for serving as a

named plaintiff in the <u>American Continental/Lincoln Savings</u>

lawsuit, and that he did not receive any compensation in <u>Newhall</u>

<u>Land</u> beyond that which he received as a member of the class.

Overt Act No. 185: In or about October 1992, Cooperman

told Cooperman Intermediary A that MILBERG WEISS would be sending

Cooperman Intermediary A a substantial amount of money, which was

Cooperman's share of MILBERG WEISS's attorneys' fees in <u>American</u>

<u>Continental/Lincoln Savings</u>.

Overt Act No. 186: On or about October 21, 1992,

BERSHAD sent to Cooperman Intermediary A a $440,000 check,

accompanied by a cover letter falsely stating the check was

Cooperman Intermediary A's "compensation for work and

responsibility in our most recent endeavor."

Overt Act No. 187: On or about October 23 1992,

Cooperman caused Cooperman Intermediary A to forward $215,000 of

the proceeds of the check described in Overt Act No. 186 to

Cooperman.

Overt Act No. 188: On or about October 26, 1992,

Cooperman paid Cooperman Plaintiff 1 $129,000 of the proceeds of

the check described in Overt Act No. 186.

**The _Fairfield Communities_ Class Action**

Overt Act No. 189: On or about June 29, 1990,

MILBERG WEISS and others caused to be filed with the court a

class action complaint in <u>Fairfield Communities</u>, naming Cooperman

as a plaintiff.

Overt Act No. 190: On or about November 29, 1990,

Cooperman, acting in concert with MILBERG WEISS, subscribed under

penalty of perjury to Answers to Interrogatories in <u>Fairfield Communities</u>, falsely stating, among other things, that Cooperman had "at no time received any bonus or incentive payment as a result of being named as a plaintiff in any class or derivative actions."

Overt Act No. 191: On or about July 17, 1990, in an under oath deposition in <u>Fairfield Communities</u>, Cooperman, acting in concert with MILBERG WEISS and others, falsely denied that he had received any benefit in connection with <u>Newhall Land</u> other than those paid to all shareholders.

Overt Act No. 192: On or about July 16, 1993, SCHULMAN represented to the Court, in support of a request for attorneys' fees in <u>Fairfield Communities</u>, that MILBERG WEISS was not seeking any incentive bonus award on behalf of Cooperman, and that Cooperman was "satisfied to participate as a class member in the recovery of his claim."

Overt Act No. 193: On or about August 10, 1993, MILBERG WEISS obtained approximately $249,962.69 in attorneys' fees in <u>Fairfield Communities</u>.

Overt Act No. 194: On or about August 16, 1993, MILBERG WEISS and BERSHAD caused to be sent to Cooperman Intermediary A a $24,996.27 check, along with a cover letter signed by BERSHAD falsely stating that the check "represents your interest in the fee earned by my firm in" <u>Fairfield Communities</u>.

Overt Act No. 195: In or about October 1993, Cooperman caused Cooperman Intermediary A to use the proceeds of the check described in Overt Act No. 194 to satisfy legal fees Cooperman owed to Cooperman Intermediary A.

### The *Columbia Savings* Class Action

Overt Act No. 196:  On or about November 9, 1989, MILBERG WEISS and others caused to be filed a class action complaint in Columbia Savings, naming Cooperman as a plaintiff.

Overt Act No. 197: On or about January 11, 1990, MILBERG WEISS, Partner B, and others caused to be falsely represented to the court in Columbia Savings, in support of a motion for class certification, that the interests of Cooperman in the lawsuit "do not in any manner conflict with, nor are they antagonistic to, those of the class."

Overt Act No. 198: On or about February 28, 1990, Cooperman, acting in concert with MILBERG WEISS, Partner B, and others, subscribed under penalty of perjury to interrogatory responses in Columbia Savings in which, among other things, he falsely stated in response to a question whether he had any "agreement, arrangement, expectation, intention, or understanding . . . with respect to receiving any payment or consideration different from the payment or consideration that may be received by other members of the putative class as a result of this litigation" the following: "I will not be treated differently than any other class member regarding any recovery."

Overt Act No. 199: On or about June 28, 1990, in an under oath deposition in the Columbia Savings lawsuit, Cooperman, acting in concert with MILBERG WEISS and others, concealed his kickback arrangement with MILBERG WEISS.

Overt Act No. 200: On or about December 28, 1993, MILBERG WEISS obtained approximately $3,926,452 in attorneys' fees in Columbia Savings.

1

Overt Act No. 201: On or about March 31, 1994, MILBERG WEISS and BERSHAD caused to be sent to Cooperman Intermediary A a $200,000 check, along with a cover letter signed by BERSHAD falsely describing the payment as "a portion of your entitlement" to the attorneys' fees in Columbia Savings.

Overt Act No. 202: In or about April 1994, Cooperman caused Cooperman Intermediary A to use the proceeds of the check described in Overt Act No. 201 to satisfy legal fees Cooperman owed to Cooperman Intermediary A.

Overt Act No. 203: On or about July 26, 1994, MILBERG WEISS obtained approximately $8,210,164 in attorneys' fees in Columbia Savings.

Overt Act No. 204: On or about July 27, 1994, MILBERG WEISS and BERSHAD caused to be sent to Cooperman Intermediary A a $200,000 check, along with a cover letter signed by BERSHAD falsely representing the payment to be "your current entitlement" to the attorneys' fees in Columbia Savings.

Overt Act No. 205: In or about July 1994, Cooperman caused Cooperman Intermediary A to use the proceeds of the check described in Overt Act No. 204 to satisfy legal fees Cooperman owed to Cooperman Intermediary A.

Overt Act No. 206: On or about September 22, 1994, MILBERG WEISS and BERSHAD caused to be sent to Cooperman Intermediary A a $191,278 check, along with a cover letter signed by BERSHAD describing the payment to be "in furtherance of our prior arrangement" concerning Columbia Savings.

Overt Act No. 207: In or about September 1994, Cooperman caused Cooperman Intermediary A to use the proceeds of

70

the check described in Overt Act No. 206 to satisfy legal fees
Cooperman owed to Cooperman Intermediary A.

### The *SCI-Television* Class Action

Overt Act No. 208: On or about March 10, 1994,
MILBERG WEISS, Partner B, and others caused to be filed a
verified class action complaint in SCI-Television, naming
Cooperman as a plaintiff, in which they falsely represented,
among other things, that Cooperman did "not have interests
antagonistic to or in conflict with those he represents as a
class representative."

Overt Act No. 209: On or about March 21, 1994, in an
under oath deposition in SCI-Television, Cooperman falsely stated
that he had never been compensated for appearing as a plaintiff
in a class action case.

Overt Act No. 210: On or about November 11, 1994,
Cooperman, acting in concert with MILBERG WEISS and others,
executed a declaration under penalty of perjury to be filed with
the court in SCI-Television, which falsely stated, among other
things, that there were no legal differences in Cooperman's
status as a class member and those of other persons within the
class; there were no unique legal issues pertaining to Cooperman
as a class representative; and Cooperman "anticipate[d] receiving
[his] pro rata share, and no more, of the damages received by
this class."

Overt Act No. 211: On or about November 1, 1995,
MILBERG WEISS and BERSHAD caused to be sent to Cooperman
Intermediary A a $100,000 check, with a cover letter signed by

BERSHAD falsely describing the check as a payment "towards your participation" in SCI-Television.

Overt Act No. 212: On or about November 2, 1995, MILBERG WEISS obtained approximately $3,218,329.50 in attorneys' fees in SCI-Television.

Overt Act No. 213: On or about November 16, 1995, MILBERG WEISS and BERSHAD caused to be sent to Cooperman Intermediary A an $81,846 check, with a cover letter signed by BERSHAD falsely describing the payment as being "with regard to your participation as counsel in [SCI Television]."

Overt Act No. 214: In or about November 1995, Cooperman caused Cooperman Intermediary A to use the proceeds of the checks described in Overt Acts Nos. 211 and 213 to satisfy legal fees Cooperman owed to Cooperman Intermediary A.

### The *Community Psychiatric* Class Action

Overt Act No. 215: On or about September 30, 1991, MILBERG WEISS and others known and unknown to the Grand Jury caused to be filed a class action complaint in Community Psychiatric, naming Cooperman as a plaintiff, in which they falsely represented, among other things, that Cooperman had "no interest which is contrary to or in conflict with those of the class [he] seek[s] to represent."

Overt Act No. 216: On or about February 16, 1996, MILBERG WEISS obtained approximately $4,123,000 in attorneys' fees in Community Psychiatric.

Overt Act No. 217: On or about November 11, 1996, MILBERG WEISS and BERSHAD caused to be issued to Cooperman a

1

$114,891.50 check, made payable to Cooperman Intermediary B,

2 relating to <u>Community Psychiatric</u>.

3        <u>Overt Act No. 218</u>: On or about November 14, 1996,

4 Cooperman deposited the check described in Overt Act No. 217 into

5 his personal bank account.

6                    **The *Heart Technology* Class Action**

7        <u>Overt Act No. 219</u>: On or about August 11, 1995,

8 Cooperman Plaintiff 2 purchased 100 shares of stock in

9 Heart Technology Inc., for the purpose of positioning

10 MILBERG WEISS and himself to file a lawsuit.

11 _____<u>Overt Act No. 220</u>:  On or about August 30, 1995,

12 MILBERG WEISS, BERSHAD, SCHULMAN, and others known and unknown to

13 the Grand Jury caused to be filed a class action complaint in

14 <u>Heart Technology</u>, naming Cooperman Plaintiff 2 as a plaintiff.

15        <u>Overt Act No. 221</u>: On or about March 13, 1997,

16 Cooperman Plaintiff 2, acting in concert with MILBERG WEISS and

17 others, subscribed under penalty of perjury to an affirmation in

18 which he falsely stated that he had "no claim or interest that is

19 adverse to Heart [Technology] or its stockholders."

20        <u>Overt Act No. 222</u>: On or about May 5, 1997,

21 MILBERG WEISS obtained approximately $198,589.63 in attorneys'

22 fees in <u>Heart Technology</u>.

23        <u>Overt Act No. 223</u>: On or about May 6, 1997,

24 MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman

25 a check payable to Cooperman Intermediary A in the amount of

26 $19,858.96, representing 10% of the fees awarded in <u>Heart</u>

27 <u>Technology</u>.

28 / / /

1

       <u>Overt Act No. 224</u>: On or about May 8, 1997, Cooperman
caused to be deposited the check described in Overt Act No. 223
into his personal bank account.

       <u>Overt Act No. 225</u>: On or about May 14, 1997, Cooperman
caused to be sent to Cooperman Intermediary A a check in the
amount of $19,858.96.

       <u>Overt Act No. 226</u>: In or about May 1997, Cooperman
caused Cooperman Intermediary A to use proceeds of the check
described in Overt Act No. 225 to satisfy legal fees owed to
Cooperman Intermediary A's law firm by Cooperman.

       <u>Overt Act No. 227</u>: On or about October 3, 1997,
Cooperman caused Cooperman Intermediary A to pay Cooperman
Plaintiff 2 $10,000, representing Cooperman Plaintiff 2's share
of the MILBERG WEISS kickback in <u>Heart Technology</u>.

### Other Overt Acts in the Cooperman Lawsuits

       <u>Overt Act No. 228</u>: On or about March 27, 1989,
MILBERG WEISS, BERSHAD, SCHULMAN, and others caused to be sent to
Cooperman Brother-in-Law B a letter, signed by SCHULMAN, falsely
characterizing Cooperman's brother-in-law as a "consultant" to
MILBERG WEISS in a case called "<u>Liberty All-Star Equity Fund</u>."

       <u>Overt Act No. 229</u>: On or about March 29, 1989,
MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman
Brother-in-Law B a $35,000 check, with a cover letter signed by
BERSHAD falsely describing the payment as Cooperman's Brother-in-
Law B's "retainer with work performed and to be performed with
regard to [<u>Liberty All-Star</u>]."

       <u>Overt Act No. 230</u>: On or about April 21, 1989,
MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman

Brother-in-Law B a $25,000 check, with a cover letter signed by BERSHAD falsely describing the payment as Cooperman's Brother-in-Law B's "retainer" in a case called "Brinkmann Instruments, Inc.."

Overt Act No. 231: On or about May 17, 1989, MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman Brother-in-Law B a $40,000 check, with a cover letter signed by BERSHAD falsely describing the payment as Cooperman's Brother-in-Law B's "retainer payment" in a case called "MDC Corporation."

Overt Act No. 232: On or about May 19, 1989, MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman Brother-in-Law B a $40,000 check, with a cover letter signed by BERSHAD falsely describing the payment as Cooperman's Brother-in-Law B's "retainer payment" in a case called "Imperial Bank."

Overt Act No. 233: On or about June 19, 1989, Cooperman caused Cooperman Brother-in-Law B to pay $65,000 of the proceeds of the MILBERG WEISS checks described in Overt Acts Nos. 230-232 to a company controlled by Cooperman.

Overt Act No. 234: On or about June 24, 1989, Cooperman caused Cooperman Brother-in-Law B to pay $60,000 of the proceeds of the MILBERG WEISS checks described in Overt Acts Nos. 230-232 to a company controlled by Cooperman.

Overt Act No. 235: On or about August 17, 1989, MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman Brother-in-Law B a $10,000 check, with a cover letter signed by BERSHAD falsely describing the entirety of the payment as Cooperman Brother-in-Law B's "retainer" in a case called "Citytrust Litigation."

1

   <u>Overt Act No. 236</u>: On or about August 28, 1989,

2 Cooperman caused Cooperman Brother-in-Law B to pay $10,000 of the

3 proceeds of the MILBERG WEISS checks described in Overt Acts

4 Nos. 230-232 and 235 to a company controlled by Cooperman.

5    <u>Overt Act No. 237</u>: On or about February 8, 1990,

6 MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman

7 Brother-in-Law B a $35,000 check, with a cover letter signed by

8 BERSHAD falsely describing the payment as Cooperman Brother-in-

9 Law B's "retainer" for his "services with regard to investigation

10 and expert analysis in connection with" a company called "<u>Lone</u>

11 <u>Star Industries</u>."

12    <u>Overt Act No. 238</u>: On or about June 12, 1990,

13 MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman

14 Brother-in-Law B a $25,000 check, with a cover letter signed on

15 behalf of BERSHAD falsely describing the entirety of the payment

16 as Cooperman Brother-in-Law B's "payment" for his "activities and

17 report" in connection with a case called "<u>Hyatt Union Square</u>

18 <u>Litigation</u>."

19    <u>Overt Act No. 239</u>: On or about November 16, 1990, in an

20 under oath deposition in <u>Valley National</u>, Cooperman, acting in

21 concert with MILBERG WEISS and others, falsely denied that he had

22 received any payment for serving as a plaintiff in

23 <u>Newhall Land</u>, and concealed his expectation that MILBERG WEISS

24 would pay him for being a class representative in

25 <u>Valley National</u>.

26    <u>Overt Act No. 240</u>: On or about February 6, 1991,

27 MILBERG WEISS, BERSHAD, and others caused to be sent to Cooperman

28 Brother-in-Law B a $35,000 check, with a cover letter signed by

BERSHAD falsely describing the entirety of the payment as Cooperman Brother-in-Law B's "retainer with regard to acting as an expert as to damages and other aspects concerning" a case called "C.R. Bard Securities Litigation."

Overt Act No. 241: On or about February 15, 1991, Cooperman caused Cooperman Brother-in-Law B to pay $33,250 of the proceeds of the MILBERG WEISS checks described in Overt Acts Nos. 230-232, 235, 237-238, and 240 to a company controlled by Cooperman.

Overt Act No. 242: On or about July 3, 1992, Cooperman, acting in concert with MILBERG WEISS and others, subscribed under penalty of perjury to answers to interrogatories in MBNA, which falsely stated that Cooperman had never, directly or indirectly, received payment from MILBERG WEISS.

Overt Act No. 243: On or about June 1, 1995, Cooperman caused to be sent to MILBERG WEISS and Partner B a letter stating, among other things, "Re: Infant Formula case - please do ASAP - our share goes to [Cooperman Intermediary A] - he's pressing me for $ - please send me copy."

Overt Act No. 244: On or about July 7, 1995, MILBERG WEISS, BERSHAD, Partner B, and others caused to be sent to Cooperman Intermediary A a $25,868 check, with a cover letter signed by BERSHAD falsely describing the payment as Cooperman Intermediary A's "share of attorneys' fees with respect to [Infant Formula]."

Overt Act No. 245: On or about April 5, 2001, MILBERG WEISS caused to be sent by interstate telefax a letter directing that an additional $507,662.71 in attorneys' fees in

77

1

<u>ACC/Lincoln Savings</u> and an additional $572,078.37 in attorneys'

2   fees in <u>Columbia Savings</u> be sent to MILBERG WEISS from the

3   settlement funds in those cases.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWO

[Defendants BERSHAD, SCHULMAN, and LAZAR]

[18 U.S.C. § 1962(d)]

[Racketeering Conspiracy]

52.  The Grand Jury hereby repeats and realleges paragraphs 1 through 39 of this Indictment.

## I.    THE ENTERPRISE

53.  At all times relevant to this Indictment, the New York law firm partnership Milberg Weiss Bershad & Schulman LLP, formerly known as "Milberg Weiss Bershad Hynes & Lerach LLP" and "Milberg Weiss Bershad Specthrie & Lerach" ("Milberg Weiss"), constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), which was engaged in, and the activities of which affected, interstate commerce.

54.  Defendants DAVID J. BERSHAD and STEVEN G. SCHULMAN were employed by and associated with the enterprise.  Defendant SEYMOUR M. LAZAR was associated with the enterprise.

## II.    PURPOSES OF THE RACKETEERING CONSPIRACY

55.  The purposes of the racketeering conspiracy included the following:

a.    to provide Milberg Weiss and its partners, including BERSHAD and SCHULMAN, with a stable of persons who were ready, willing, and able to serve, and whom the courts would likely approve to serve, as named plaintiffs representing absent class members and shareholders in the Lawsuits;

b.    to enable Milberg Weiss and its partners, including BERSHAD and SCHULMAN, to file and maintain the Lawsuits;

79

1

     c.   to assist Milberg Weiss and its partners,
including BERSHAD and SCHULMAN, in securing lead counsel status
in the Lawsuits; and

     d.   to enrich BERSHAD, SCHULMAN, LAZAR, and the other
members and associates of the enterprise through the more than
approximately $ 216.1 million dollars of attorneys' fees
Milberg Weiss obtained in the Lawsuits and litigation resolving
the Lawsuits and the more than approximately $ 11.3 million
dollars in kickbacks that BERSHAD, SCHULMAN, and others paid and
caused to be paid to the Paid Plaintiffs.

## III. **THE RACKETEERING CONSPIRACY**

56.  Beginning on a date unknown but at least as early as in
or about 1981, and continuing through at least in or about 2005,
within the Central District of California and elsewhere,
defendants BERSHAD, SCHULMAN, and LAZAR, together with other
persons known and unknown to the Grand Jury, being persons
employed by and associated with the enterprise described in
paragraph 53 above, which enterprise engaged in, and the
activities of which affected, interstate and foreign commerce,
knowingly and intentionally conspired to violate 18 U.S.C.
§ 1962(c), that is, to conduct and participate, directly and
indirectly, in the conduct of the affairs of that enterprise
through a pattern of racketeering activity, as that term is
defined in Sections 1961(1) and 1961(5) of Title 18, United
States Code, consisting of multiple acts indictable under the
following provisions of federal law:

     a.   18 U.S.C. §§ 2, 1503 (obstruction of justice);

80

1

    b.   18 U.S.C. §§ 2, 1952(a)(1), (3) (travel and use of

2         facilities in interstate commerce, in furtherance

3         of commercial bribery);

4     c.   18 U.S.C. §§ 2, 1341, 1346 (mail fraud involving

5         the deprivation of money and property and honest

6         services);

7     d.   18 U.S.C. §§ 2, 1343, 1346 (wire fraud involving

8         the deprivation of money and property and honest

9         services);

10     e.   18 U.S.C. §§ 2, 201(c)(2) (illegal witness

11         payments); and

12     f.   18 U.S.C. §§ 2, 1956 (money laundering).

13    57.  It was a further part of the conspiracy that each

14 defendant agreed that a conspirator would commit at least two

15 acts of racketeering activity in the conduct of the affairs of

16 the enterprise.

17 **IV.  MANNER AND MEANS OF THE CONSPIRACY**

18    58.  The object of the conspiracy was carried out in the

19 manner and by the means described in paragraphs 42 through 50

20 above, which the Grand Jury incorporates herein by reference.

21

22

23

24

25

26

27

28

COUNTS THREE THROUGH FIVE

[Defendant LAZAR]

[18 U.S.C. §§ 1341, 1346, 2]

[Mail Fraud; Aiding and Abetting; and Causing An Act to be Done]

59.  The Grand Jury hereby repeats and realleges paragraphs 1 through 34 and 42 through 50 of this Indictment.

60.  Beginning on a date unknown to the Grand Jury but at least as early as in or about 1981, and continuing until at least in or about 2004, within the Central District of California and elsewhere, defendant SEYMOUR M. LAZAR, together with Milberg Weiss, Bershad, Schulman, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud absent class members and shareholders in the Lazar Lawsuits as to a material matter, by depriving these victims of the honest services of Milberg Weiss, lawyers in Milberg Weiss, and LAZAR.

61.  On or about the following dates, within the Central District of California and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud, defendant LAZAR, aided and abetted by Milberg Weiss, Bershad, and others known and unknown to the Grand Jury, caused the following items to be placed in an authorized depository for mail matter and to be sent and delivered by the United States Postal Service, and to be deposited to be sent and delivered by private and commercial carrier, according to the directions thereon:

82

| COUNT | DATE | ITEM |
|-------|------|------|
| THREE | 05/25/00 | $125,000 check from Milberg Weiss in New York, New York, to the Palm Springs Law Firm in Rancho Mirage, California |
| FOUR | 06/15/00 | $30,564.03 check from the Palm Springs Law Firm in Indian Wells, California, to the Selzer Law Firm in Palm Springs, California |
| FIVE | 07/24/00 | $18,975 check from the Palm Springs Law Firm in Indian Wells, California, to the Selzer Law Firm in Palm Springs, California |

83

1

COUNTS SIX THROUGH EIGHT

2      [Defendants MILBERG WEISS, BERSHAD, SCHULMAN and LAZAR]

3                  [18 U.S.C. §§ 1341, 1346, 2]

4    [Mail Fraud; Aiding and Abetting; and Causing An Act to be Done]

5        62.   The Grand Jury hereby repeats and realleges paragraphs

6    1 through 34 and 42 through 50 of this Indictment.

7        63.   Beginning on a date unknown to the Grand Jury but at

8    least as early as in or about 1981, and continuing until at least

9    in or about 2004, within the Central District of California and

10   elsewhere, defendants MILBERG WEISS, DAVID J. BERSHAD,

11   STEVEN G. SCHULMAN, and SEYMOUR M. LAZAR, together with others

12   known and unknown to the Grand Jury, knowingly and with intent to

13   defraud, devised, participated in, and executed a scheme to

14   defraud absent class members and shareholders in the

15   Lazar Lawsuits as to a material matter, by depriving these

16   victims of money and property and of the honest services of

17   MILBERG WEISS, lawyers in MILBERG WEISS, and LAZAR, and to obtain

18   money and property by means of material false and fraudulent

19   pretenses, representations, and promises.

20       64.   On or about the following dates, within the Central

21   District of California and elsewhere, for the purpose of

22   executing and attempting to execute the above-described scheme to

23   defraud, defendants MILBERG WEISS, BERSHAD, SCHULMAN, LAZAR, and

24   others known and unknown to the Grand Jury, aided and abetted by

25   each other and by others known and unknown to the Grand Jury,

26   caused the following items to be placed in an authorized

27   depository for mail matter and to be sent and delivered by the

28   United States Postal Service, and to be deposited to be sent and

                                84

1

delivered by private and commercial carrier, according to the

2  directions thereon:

3

| COUNT | DATE | ITEM |
|-------|------|------|
| SIX | 12/28/00 | $50,000 check from MILBERG WEISS in New York, New York, to the Palm Springs Law Firm in Indian Wells, California |
| SEVEN | 06/18/01 | Letter from BERSHAD in New York City to the Palm Springs Law Firm in Palm Springs, California |
| EIGHT | 07/09/01 | $133,000 check from MILBERG WEISS in New York, New York, to the Palm Springs Law Firm in Indian Wells, California |

85

COUNT NINE

[Defendants MILBERG WEISS, BERSHAD, LAZAR, and SELZER]

[18 U.S.C. § 1956(h)]

[Money Laundering Conspiracy]

65. The Grand Jury hereby repeats and realleges paragraphs 1, 2, 5, and 6 of this Indictment.

I.    **INTRODUCTION**

66. As used in this Count Nine, the term "Specified Unlawful Activity" includes all acts and activities described in Counts One and Three through Eight concerning defendant LAZAR that are indictable as: (a) obstruction of justice, in violation of Title 18, United States Code, Section 1503; (b) mail fraud involving deprivation of honest services, in violation of Title 18, United States Code, Sections 1341 and 1346; (c) wire fraud involving deprivation of honest services, in violation of Title 18, United States Code, Sections 1343 and 1346; (d) mail fraud involving a scheme to obtain money and property in violation of Title 18, United States Code, Section 1341; (e) wire fraud involving a scheme to obtain money and property in violation of Title 18, United States Code, Section 1343; and (f) illegal witness payments, in violation of Title 18, United States Code, Section 201(c)(2).

67. As a result of the Specified Unlawful Activity, MILBERG WEISS was awarded, obtained, and retained ownership and control of certain monies and property, including more than $44 million in attorneys' fees that were awarded to MILBERG WEISS in the Lazar Lawsuits, which became the proceeds of the Specified

86

1

Unlawful Activity no later than upon receipt of these funds by

2   MILBERG WEISS.

3   **II.    THE OBJECTS OF THE MONEY LAUNDERING CONSPIRACY**

4       68.  Beginning on or about October 28, 1992 (the date on

5   which Title 18, United States Code, Section 1956(h) was enacted),

6   and continuing until at least in or about 2004, in the Central

7   District of California and elsewhere, defendants MILBERG WEISS,

8   DAVID J. BERSHAD, SEYMOUR M. LAZAR, and PAUL T. SELZER, together

9   with others known and unknown to the Grand Jury, knowingly

10  combined, conspired, and agreed to commit the following money

11  laundering offenses against the United States:

12          a.   To commit concealment money laundering by

13  knowingly conducting, willfully causing others to conduct, and

14  attempting to conduct and to cause others to conduct financial

15  transactions involving the proceeds of Specified Unlawful

16  Activity, knowing that the property involved in the transactions

17  represented the proceeds of some form of unlawful activity, and

18  knowing that the transactions were designed, in whole or in part,

19  to conceal or disguise the nature, source, ownership, or control

20  of the proceeds of Specified Unlawful Activity, in violation of

21  Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2(b);

22  and

23          b.   To commit promotional money laundering by

24  knowingly conducting, willfully causing others to conduct, and

25  attempting to conduct and to cause others to conduct financial

26  transactions involving the proceeds of Specified Unlawful

27  Activity, knowing that the property involved in the transactions

28  represented the proceeds of some form of unlawful activity, with

87

the intent to promote the carrying on of Specified Unlawful
Activity, in violation of Title 18, United States Code,
Section 1956(a)(1)(A)(i) and 2(b).

III.  **THE MANNER AND MEANS OF THE MONEY LAUNDERING CONSPIRACY**

69.  The objects of the money laundering conspiracy were
carried out, in part, in the manner and by the means described
below.

70.  As described in Count One of this Indictment,
MILBERG WEISS, BERSHAD, and others known and unknown to the
Grand Jury paid and caused to be paid secret and illegal
kickbacks to LAZAR through SELZER and the other intermediary law
firms and lawyers.

71.  As further described in Count One of this Indictment,
SELZER and the other intermediary law firms and lawyers used and
applied the kickback payments at LAZAR's direction and for his
benefit, including to: (a) satisfy legal fees and expenses that
LAZAR owed to SELZER and the other intermediary law firms and
lawyers, for work related to LAZAR's real estate holdings and
personal matters; (b) pay real estate appraisers, engineers,
surveyors, and others who performed work for LAZAR relating to
his real estate holdings; (c) pay permitting fees relating to
LAZAR's real estate holdings; (d) make political contributions on
LAZAR's behalf; (e) make and maintain investments for the benefit
of LAZAR; (f) make payments to and for the benefit of one of
LAZAR's sons; and (g) make payments directly to LAZAR.

72.  These transactions concealed and disguised the nature,
source, ownership, and control of the proceeds of Specified
Unlawful Activity by, among other means: (a) concealing and

88

disguising the payments from MILBERG WEISS to SELZER and the other of LAZAR's intermediary law firms and lawyers as fees paid to and for the benefit of the law firms and lawyers, when in fact they were secret and illegal kickback payments to and for the benefit of LAZAR; and (b) concealing and disguising the payments by SELZER and the other of LAZAR's intermediary law firms and lawyers to and for the benefit of LAZAR as payments involving legitimately obtained proceeds of LAZAR, when in fact they were secret and illegal kickback payments from MILBERG WEISS.

73. These transactions promoted the Specified Unlawful Activity by, among other means: (a) inducing and rewarding LAZAR for serving and causing his wife to serve as named plaintiffs in the Lazar Lawsuits; (b) causing LAZAR to make false statements, conceal material facts, and engage in other dishonest conduct in the Lazar Lawsuits in order to maintain the secrecy of his illegal kickback arrangement with MILBERG WEISS; and (c) ensuring that LAZAR would serve and cause his wife to serve as named plaintiffs in future Lazar Lawsuits to be brought by MILBERG WEISS.

COUNTS TEN THROUGH THIRTEEN

[Defendants LAZAR and SELZER]

[18 U.S.C. §§ 1956(a)(1)(B)(i) and 2]

[Concealment Money Laundering; Aiding and Abetting

and Causing An Act to be Done]

74.  The Grand Jury hereby repeats and realleges paragraphs 1, 2, 5, 6, 66, 67, and 69 through 73 of this Indictment.

75.  On or about the dates listed below, within the Central District of California and elsewhere, defendants SEYMOUR M. LAZAR and PAUL T. SELZER, aided and abetted by each other and by others known and unknown to the Grand Jury, conducted and willfully caused others to conduct the following financial transactions affecting interstate commerce, which transactions in fact involved the proceeds of Specified Unlawful Activity (as defined in paragraph 66 in Count Nine above), knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, source, ownership, and control of the proceeds of Specified Unlawful Activity:

| COUNT | DATE | TRANSACTION |
| --- | --- | --- |
| TEN | 06/22/00 | transfer of approximately $30,564 from the Palm Springs Law Firm's business checking account (Bank of America account # XXXXX-X0990) to the Selzer Law Firm's business checking account (Union Bank of California account #XXXXXX4299) |

90

1

| COUNT | DATE | TRANSACTION |
|-------|------|-------------|
| ELEVEN | 06/26/00 | transfer of approximately $5,000 from the Selzer Law Firm's client trust account (Union Bank of California account #XXXXX-X0884) to LAZAR's personal trust account (Bank of America account # XXXXX-X8703, in the name "Paul T. Selzer, FBO Seymour Lazar") |
| TWELVE | 07/25/00 | transfer of approximately $18,975 from the Palm Springs Law Firm's business checking account (Bank of America account #XXXXX-X0990) to the Selzer Law Firm's client trust account (Union Bank of California #XXXXXX0884) |
| THIRTEEN | 08/10/00 | transfer of approximately $19,100 from the Selzer Law Firm's client trust account (Union Bank of California account #XXXXXX0884) to LAZAR's personal trust account (Bank of America account # XXXXX-X8703, in the name "Paul T. Selzer, FBO Seymour Lazar") |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

91

COUNTS FOURTEEN THROUGH SIXTEEN

[Defendant LAZAR]

[26 U.S.C. § 7206(1)]

[Subscribing to False Tax Return]

76.  The Grand Jury hereby repeats and realleges paragraphs
1 through 34 and 42 through 50 of this Indictment.

77.  On or about the following dates, in Riverside County,
within the Central District of California, defendant
SEYMOUR M. LAZAR willfully made and subscribed a Personal Income
Tax Return Form 1040 for the tax years identified below, which
contained and was verified by a written declaration that it was
made under the penalties of perjury, and which LAZAR knew and
believed was not true and correct as to a material matter, in
that it failed to report as income kickbacks paid during the year
by Milberg Weiss for LAZAR's benefit, in the following amounts:

| COUNT | DATE | TAX YEAR | AMOUNT OF KICKBACKS FROM MILBERG WEISS |
|---|---|---|---|
| FOURTEEN | 10/17/00 | 1999 | $ 125,000 |
| FIFTEEN | 10/12/01 | 2000 | $ 175,000 |
| SIXTEEN | 05/21/03 | 2001 | $ 133,000 |

92

COUNT SEVENTEEN

[Defendant LAZAR]

[18 U.S.C. §§ 1503, 2]

[Obstruction of Justice; Causing An Act to be Done]

78.  The Grand Jury hereby repeats and realleges paragraphs 1 through 39 and 42 through 50 of this Indictment.

79.  At all times relevant to this Count Seventeen, there was pending in the Central District of California a federal grand jury proceeding involving allegations that Milberg Weiss had paid secret and illegal kickbacks to named plaintiffs in class actions and shareholder derivative actions, including LAZAR (the "Grand Jury Proceeding").

80.  On or about January 9, 2002, LAZAR was personally served at his residence in Palm Springs, California, with a grand jury subpoena (the "Subpoena").  The Subpoena required LAZAR to produce to the Grand Jury certain specified documents relating to the Grand Jury Proceeding that were in his possession, custody, or control, which, as defined and instructed by the Subpoena, included documents that were in the possession of LAZAR's accountant and tax return preparer.

81.  In or about February 2002, within the Central District of California, defendant SEYMOUR M. LAZAR corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice in the Grand Jury Proceeding by directing his accountant and tax return preparer to destroy certain documents relating to LAZAR, including documents that LAZAR knew: (a) were responsive to the Subpoena; and (b) were and would become relevant to the Grand Jury Proceeding.

93

1

COUNT EIGHTEEN

2    [Defendants MILBERG WEISS, BERSHAD, SCHULMAN, and LAZAR]

3      [28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C),

4         and 21 U.S.C. § 853]

5          [Criminal Forfeiture]

6     82.  The allegations contained in Count One of this

7 Indictment are hereby repeated, realleged, and incorporated by

8 reference herein as though fully set forth at length for the

9 purpose of alleging forfeiture pursuant to the provisions of

10 Title 28, United States Code, Section 2461(c), Title 18, United

11 States Code, Section 981(a)(1)(C), and Title 21, United States

12 Code, Section 853.

13     83.  Pursuant to Title 28, United States Code,

14 Section 2461(c), Title 18, United States Code,

15 Section 981(a)(1)(C), and Title 21, United States Code,

16 Section 853, each of defendants MILBERG WEISS,

17 DAVID J. BERSHAD, STEVEN G. SCHULMAN, and SEYMOUR M. LAZAR

18 convicted under Count One of this Indictment shall forfeit to the

19 United States any and all property, real or personal, which

20 constitutes or is derived from proceeds traceable to such

21 offense, including the following:

22        a.  with respect to MILBERG WEISS, the more than

23 approximately $ 216.1 million in attorneys' fees obtained by

24 MILBERG WEISS in the Lawsuits and litigation resolving the

25 Lawsuits (the "tainted attorneys' fees");

26        b.  with respect to BERSHAD, SCHULMAN, and LAZAR, the

27 portion of the tainted attorneys' fees that each of these

28 defendants received, namely:

i.   the more than approximately $ 26.6 million in tainted attorneys' fees that BERSHAD received as a result of his partnership interest in MILBERG WEISS;

ii.   the more than approximately $ 9.5 million in tainted attorneys' fees that SCHULMAN received as a result of his partnership interest in MILBERG WEISS; and

iii. the more than approximately $ 1.2 million that LAZAR received as kickback payments derived from the tainted attorneys' fees;

c.   A sum of money equal to the total amount of proceeds traceable to such offense, which sum for each defendant will be up to the following approximate amount:

| Defendant | Amount |
| --- | --- |
| MILBERG WEISS . . . | $ 216.1 million |
| BERSHAD . . . . . . | $ 216.1 million |
| SCHULMAN. . . . . . | $ 216.1 million |
| LAZAR  . . . . . . | $  57.7 million |

84.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each of defendants MILBERG WEISS, BERSHAD, SCHULMAN, and LAZAR, if so convicted, shall forfeit substitute property, up to the value of the amount described in the preceding paragraph, if, by any act or omission of the defendant, the property described therein, or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

95

1

commingled with other property which cannot be divided without

2  difficulty.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINETEEN

[Defendants BERSHAD, SCHULMAN, and LAZAR]

[18 U.S.C. § 1963]

[Criminal Forfeiture]

85.   The allegations contained in Count Two of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.  Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count Two of this Indictment.

86.   The defendants, DAVID J. BERSHAD, STEVEN G. SCHULMAN, and SEYMOUR M. LAZAR:

a.   have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.   have an interest in, security of, claims against, and property and contractual rights that afford a source of influence over, the enterprise named and described herein, which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(2); and

97

1

     c.   have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

    87.  The properties of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include but are not limited to:

     a.   any and all interests any of the defendants BERSHAD and SCHULMAN has in Milberg Weiss.

     b.   defendant BERSHAD's share of the more than approximately $ 216.1 million in attorneys' fees obtained by Milberg Weiss in the Lawsuits and litigation resolving the Lawsuits, which share exceeds approximately $ 26.6 million;

     c.   defendant SCHULMAN's share of the more than approximately $ 216.1 million in attorneys' fees obtained by Milberg Weiss in the Lawsuits and litigation resolving the Lawsuits, which share exceeds approximately $ 9.5 million; and

     d.   with respect to LAZAR, the more than $2.4 million in illegal kickback payments he acquired from Milberg Weiss; and

     e.   a sum of money equal to the total amount of proceeds the defendants derived from proceeds obtained, directly and indirectly, from racketeering activity, in the minimum amount of $38.5 million.

98

88. If any of the property described in the preceding paragraph as being subject to forfeiture, as a result of any act or omission of any defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

89. The above-named defendants, MILBERG WEISS, BERSHAD, SCHULMAN, and LAZAR, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

COUNT TWENTY

[MILBERG WEISS, BERSHAD, LAZAR, SELZER]

[18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853]

[Criminal Forfeiture]

90.   The allegations contained in Count Nine of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982, and Title 21, United States Code, Section 853.

91.   Pursuant to Title 18, United States Code, Section 982(a)(1), each of defendants MILBERG WEISS, DAVID J. BERSHAD, SEYMOUR M. LAZAR, and PAUL T. SELZER convicted under Count Nine of this Indictment shall forfeit to the United States the following property:

   a.   All right, title, and interest in any and all property involved in each offense in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offense, for which the defendant is convicted, and all property traceable to such property, including the following:

      (1) all money or other property that was the subject of each transaction in violation of Title 18, United States Code, Sections 1956(h) and/or 1956(a)(1)(A)(I);

      (2) all commissions, fees, and other property constituting proceeds obtained as a result of those violations;

      (3) all property used in any manner or part to commit or to facilitate the commission of those violations; and

100

1

         (4) all property traceable to money or property

2  described in this paragraph 91.a.(1) to 91.a.(3).

3        b.    A sum of money equal to the total amount of money

4  involved in each offense in violation of Title 18, United States

5  Code, Section 1956, or conspiracy to commit such offense, for

6  which the defendant is convicted, which sum for each defendant

7  will be up to at least $ 883,463.

8     92.   If, as a result of any act or omission by defendants

9  MILBERG WEISS, BERSHAD, LAZAR, or SELZER, any of the foregoing

10  money or property (a) cannot be located upon the exercise of due

11  diligence; (b) has been transferred or sold to, or deposited

12  with, a third party; (c) has been placed beyond the jurisdiction

13  of the court; (d) has been substantially diminished in value; or

14  (e) has been commingled with other property that cannot be

15  subdivided without difficulty, then any other property or

16  / / /

17  / / /

18  / / /

19

20

21

22

23

24

25

26

27

28

interests of that defendant, up to the value of the money and property described in the preceding paragraph of this Indictment, shall be subject to forfeiture to the United States.

A TRUE BILL

_____
Foreperson

DEBRA WONG YANG
United States Attorney


GEORGE S. CARDONA
Chief Assistant United States Attorney

THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division

DOUGLAS A. AXEL
Assistant United States Attorney
Deputy Chief, Major Frauds Section

RICHARD E. ROBINSON
ROBERT J. McGAHAN
Assistant United States Attorneys
Major Frauds Section