EXHIBIT F

*c.c. Judge*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2006 Grand Jury

FILED
2007 SEP 20 PM 2: 32

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 05-587(D)-JFW |
| Plaintiff, | **S E C O N D** |
| v. | **S U P E R S E D I N G** **I N D I C T M E N T** |
| MILBERG WEISS LLP, MELVYN I. WEISS, SEYMOUR M. LAZAR, and PAUL T. SELZER, | [18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1962(d): Racketeering Conspiracy; 18 U.S.C. §§ 1341 & 1346: Mail Fraud; 18 U.S.C. § 1956(h): Money Laundering Conspiracy; 18 U.S.C. § 1956(a)(1)(B)(i): |
| Defendants. | Money Laundering; 26 U.S.C. § 7206(1): Subscribing to False Tax Return; 18 U.S.C. § 1503: Obstruction of Justice; 18 U.S.C. § 1001: False Statements; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C) & 21 U.S.C. § 853: Criminal Forfeiture; 18 U.S.C. § 1963: Criminal Forfeiture; 18 U.S.C. § 982(a)(1) & 21 U.S.C. § 853: Criminal Forfeiture] |

DAA:RER:RJM

## TABLE OF CONTENTS

PAGE

INTRODUCTORY ALLEGATIONS . . . . . . . . . . . . . . . . . . 1

    I.    DEFENDANTS . . . . . . . . . . . . . . . . . . . 1

    II.   OTHER INDIVIDUALS . . . . . . . . . . . . . . . 3

    III. CLASS ACTIONS AND SHAREHOLDER DERIVATIVE
         ACTIONS . . . . . . . . . . . . . . . . . . . 4

        A.   Overview . . . . . . . . . . . . . . . 4

        B.   Benefits of Securing "Lead Counsel" Status . . . 5

        C.   Fiduciary Duties of Named Plaintiffs and
           Their Attorneys . . . . . . . . . . . . 6

        D.   Court Approval of Settlements and Awards of
           Attorneys' Fees . . . . . . . . . . . . 7

        E.   Limitations on Compensation of Named
           Plaintiffs . . . . . . . . . . . . . . . 8

    IV.  DEFENDANTS' SECRET AND ILLEGAL KICKBACK SCHEME
       IN CLASS ACTIONS AND SHAREHOLDER DERIVATIVE
       ACTIONS . . . . . . . . . . . . . . . . . . . 9

    V.   SUMMARY OF KICKBACK PAYMENTS . . . . . . . . . 13

COUNT ONE [18 U.S.C. § 371][Conspiracy] . . . . . . . . . 15

    I.    THE OBJECTS OF THE CONSPIRACY . . . . . . . . . 15

    II.   MANNER AND MEANS OF THE CONSPIRACY . . . . . . 17

    III. OVERT ACTS . . . . . . . . . . . . . . . . . 24

COUNT TWO [18 U.S.C. § 1962(d)][Racketeering Conspiracy] . . 46

    I.    THE ENTERPRISE . . . . . . . . . . . . . . . 46

    II.   PURPOSES OF THE RACKETEERING CONSPIRACY . . . . . . 46

    III. THE RACKETEERING CONSPIRACY . . . . . . . . . . 47

    IV.  MANNER AND MEANS OF THE CONSPIRACY . . . . . . . 48

COUNTS THREE THROUGH FIVE [18 U.S.C. §§ 1341, 1346, 2]
[Mail Fraud; Aiding and Abetting; and Causing An Act
to be Done] . . . . . . . . . . . . . . . . . . . . . 49

COUNTS SIX THROUGH EIGHT [18 U.S.C. §§ 1341, 1346, 2]
[Mail Fraud; Aiding and Abetting; and Causing An Act
to be Done] . . . . . . . . . . . . . . . . . . . . . 51

i

COUNT NINE [18 U.S.C. § 1956(h)][Money Laundering
Conspiracy] . . . . . . . . . . . . . . . . . . . . . .    53

    I.    INTRODUCTION  . . . . . . . . . . . . . . . .    53

    II.   THE OBJECTS OF THE MONEY LAUNDERING
          CONSPIRACY . . . . . . . . . . . . . . . . .    54

    III.  THE MANNER AND MEANS OF THE MONEY
          LAUNDERING CONSPIRACY . . . . . . . . . . .    55

COUNTS TEN THROUGH THIRTEEN
[18 U.S.C. §§ 1956(a)(1)(B)(i) and 2][Concealment
Money Laundering; Aiding and Abetting and
Causing An Act to be Done]  . . . . . . . . . . . . .    57

COUNTS FOURTEEN THROUGH SIXTEEN [26 U.S.C. § 7206(1)]
[Subscribing to False Tax Return] . . . . . . . . . .    59

COUNT SEVENTEEN [18 U.S.C. §§ 1503, 2][Obstruction
of Justice; Causing An Act to be Done]  . . . . . . .    60

COUNT EIGHTEEN [18 U.S.C. §§ 1503, 2][Obstruction
of Justice; Causing An Act to be Done]  . . . . . . .    61

COUNT NINETEEN [18 U.S.C. §§ 1001, 2][Making Material
False Statements; Causing An Act to be Done]  . . . .    63

COUNT TWENTY [28 U.S.C. § 2461(c),
18 U.S.C. § 981(a)(1)(C), and 21 U.S.C. § 853]
[Criminal Forfeiture] . . . . . . . . . . . . . . . .    65

COUNT TWENTY-ONE [18 U.S.C. § 1963]
[Criminal Forfeiture] . . . . . . . . . . . . . . . .    67

COUNT TWENTY-TWO [18 U.S.C. § 982(a)(1)
and 21 U.S.C. § 853][Criminal Forfeiture] . . . . . .    70

1  The Grand Jury charges:

2  **INTRODUCTORY ALLEGATIONS**

3  **I.    DEFENDANTS**

4      1.    At all times relevant to this Indictment, defendant

5  MILBERG WEISS LLP, formerly known as "Milberg Weiss Bershad &

6  Schulman LLP," "Milberg Weiss Bershad Hynes & Lerach LLP,"

7  "Milberg Weiss Bershad Specthrie & Lerach," and "Milberg Weiss

8  Bershad & Specthrie" ("MILBERG WEISS"), was a New York law firm

9  partnership with principal offices in New York, New York and,

10  through on or about May 1, 2004, San Diego, California.  At all

11  times relevant to this Indictment, MILBERG WEISS represented

12  plaintiffs in class actions and shareholder derivative actions in

13  federal and state courts throughout the United States, including

14  in the Central District of California.

15      2.    Defendant MELVYN I. WEISS ("WEISS") co-founded

16  MILBERG WEISS with Lawrence Milberg in or before 1972.  At all

17  times relevant to this Indictment, WEISS was a name partner in

18  MILBERG WEISS.  During the times relevant to this Indictment,

19  WEISS resided primarily in New York and worked primarily in

20  MILBERG WEISS's New York office.  During the years 1983 through

21  2005, WEISS owned between 13.5% and 39.4% of the firm, and his

22  share of MILBERG WEISS's profits totaled approximately $209.9

23  million.

24      3.    During the times relevant to this Indictment, defendant

25  WEISS possessed substantial control over the management and

26  conduct of MILBERG WEISS's business affairs.  Prior to on or

27  about January 1, 1999, WEISS, as an original managing partner,

28  possessed the authority to veto any proposed action or decision

1  affecting the operation or management of MILBERG WEISS, including
2  deciding who became a partner in MILBERG WEISS and how much they
3  earned.  Between on or about January 1, 1999 and May 1, 2004,
4  WEISS, as Co-Chair of MILBERG WEISS's Executive Committee, shared
5  final decision-making authority over all actions or decisions
6  affecting the operation or management of the firm.  After on or
7  about June 16, 2004, WEISS again possessed the authority to veto
8  any action or decision affecting MILBERG WEISS.

9       4.   At all times relevant to this Indictment, defendant
10 SEYMOUR M. LAZAR ("LAZAR") resided in Palm Springs, California;
11 owned and controlled substantial real property throughout
12 Riverside County, California, and elsewhere; and was an active
13 purchaser and seller of publicly traded stocks.  Beginning in or
14 about 1976 and continuing through at least in or about 2004,
15 LAZAR and certain of his family members frequently served as
16 plaintiffs in class actions and shareholder derivative actions
17 brought and caused to be brought by MILBERG WEISS, WEISS, and
18 others.

19      5.   At all times relevant to this Indictment, defendant
20 PAUL T. SELZER ("SELZER") was a California lawyer residing in
21 Palm Springs, California.  Prior to in or about July 1995, SELZER
22 was a partner in a law firm that maintained offices in Palm
23 Springs and elsewhere in California (the "Palm Springs Law
24 Firm"), which specialized in real estate, business, and municipal
25 law.  In or about July 1995, SELZER left the Palm Springs Law
26 Firm to co-found a small law firm in Palm Springs, California
27 (the "Selzer Law Firm"), where he was a partner through in or
28 about 2004.  At all times relevant to this Indictment, SELZER,

1  the Palm Springs Law Firm, and the Selzer Law Firm provided legal

2  services to defendant LAZAR relating to his business and real

3  estate holdings and other personal affairs.  SELZER specialized

4  in non-litigation matters and had no expertise in litigating

5  class actions or shareholder derivative actions; the other

6  attorneys at the Palm Springs and Selzer Law Firms likewise had

7  little if any experience in litigating class actions or

8  shareholder derivative actions.

9  II.  **OTHER INDIVIDUALS**

10      6.    During the times relevant to this Indictment,

11  William S. Lerach ("Lerach"), David J. Bershad ("Bershad"),

12  Steven G. Schulman ("Schulman"), "Partner E," "Partner F," and

13  "Partner G" were senior partners in MILBERG WEISS.

14      7.    During the times relevant to this Indictment,

15  Howard J. Vogel ("Vogel") worked primarily as a commercial real

16  estate mortgage broker.  Between in or about 1991 and 2005,

17  Vogel, certain of his family members, and entities he controlled

18  frequently served as plaintiffs in class actions and shareholder

19  derivative actions brought and caused to be brought by

20  MILBERG WEISS, WEISS, and others.

21      8.    Prior to in or about May 1989, Steven G. Cooperman

22  ("Cooperman") was a licensed ophthalmologist.  Between in or

23  about 1988 and 1998, Cooperman and certain of his relatives and

24  associates, including "Cooperman Plaintiff 1" and "Cooperman

25  Plaintiff 2," frequently served as plaintiffs in class actions

26  and shareholder derivative actions brought and caused to be

27  brought by MILBERG WEISS, WEISS, and others.

28  / / /

3

1    9.    Beginning in or before 1983 and continuing through at

2 least in or about 1999, three individuals who resided, at times,

3 in Florida ("Florida Plaintiff 1," "Florida Plaintiff 2," and

4 "Florida Plaintiff 3"; collectively the "Florida Plaintiffs")

5 frequently served as plaintiffs in class actions and shareholder

6 derivative actions brought and caused to be brought by

7 MILBERG WEISS, WEISS, and others.

8 **III.  CLASS ACTIONS AND SHAREHOLDER DERIVATIVE ACTIONS**

9    **A.    Overview**

10    10.    The term "class action" refers to a certain type of

11 civil lawsuit in which a court authorizes a named plaintiff to

12 represent and litigate claims on behalf of unnamed class members

13 who are not actually before the court (referred to as "absent

14 class members").

15    11.    Class actions often are brought to address allegations

16 of fraud; breaches of certain legal duties of fidelity, trust,

17 and loyalty (known as "fiduciary duties"); and other financial

18 wrongdoing affecting publicly traded companies.  Class actions

19 also often are brought to address allegations that a consumer

20 product or service was defective, deceptively represented, or

21 illegally priced.

22    12.    A judgment in a class action (whether the result of a

23 trial or a settlement) typically binds absent class members who

24 do not expressly notify the court that they wish to "opt out" of

25 the litigation.

26    13.    The term "shareholder derivative action" refers to a

27 certain type of civil lawsuit in which a named plaintiff, who is

28 a shareholder in a corporation, is authorized by a court to

4

1  represent the interests of other shareholders of the corporation,
2  as well as the corporation itself, in seeking the adjudication of
3  rights and obligations of the corporation.  As in a class action,
4  a judgment in a shareholder derivative action typically binds
5  unnamed shareholders who are not before the court.

6       14.  Before a judgment in a class action or shareholder
7  derivative action may bind absent class members or shareholders,
8  a named plaintiff and the attorneys who seek to represent absent
9  class members or shareholders have to demonstrate to the court's
10  satisfaction, among other things, that: (a) the named plaintiff's
11  claims are "typical" of the claims of the absent class members or
12  shareholders; (b) the named plaintiff has no material interest in
13  the outcome of the action that is antagonistic to, or in conflict
14  with, the interests of the absent class members or shareholders;
15  (c) the named plaintiff is not subject to unique defenses that
16  could become the focus of the litigation to the detriment of the
17  absent class members or shareholders; and (d) the named
18  plaintiff's attorneys will be able to fairly and adequately
19  represent the interests of the absent class members or
20  shareholders.

21       15.  The court's determination that a lawsuit may proceed
22  as a class action or shareholder derivative action is referred to
23  as the "certification" of the action.

24       **B.    Benefits of Securing "Lead Counsel" Status**

25       16.  In many class actions and shareholder derivative
26  actions, more than one named plaintiff and more than one lawyer
27  or law firm seek to represent, and are approved by the court to
28  represent, the interests of absent class members or shareholders.

1    In such cases, the lawyers and law firms often compete to be

2    appointed by the court as "lead counsel" or "co-lead counsel" for

3    the absent class members or shareholders.  A lawyer or law firm

4    that is appointed as lead or co-lead counsel typically has power

5    and responsibility, among other things, to: (a) coordinate the

6    overall litigation strategy; (b) assign the work to be done on

7    the case among lawyers and law firms who have been approved to

8    represent the class members or shareholders; and (c) in some

9    cases, determine the division of attorneys' fees awarded by the

10   court among the lawyers and law firms who have worked on the

11   case.

12        C.    **Fiduciary Duties of Named Plaintiffs and**
               **Their Attorneys**
13

14        17.   Because the conduct and decisions of a named plaintiff

15   in a class action or shareholder derivative action affect the

16   interests and rights of class members or shareholders who are not

17   before the court, the named plaintiff owes these absent class

18   members or shareholders certain fiduciary duties.  As a result of

19   these legally imposed duties, a named plaintiff, among other

20   things: (a) may not place his or her own interests above those of

21   absent class members or shareholders; (b) may not act in a

22   deceitful or unethical manner toward the court or the absent

23   class members or shareholders; and (c) is required to disclose to

24   the court any fact that reasonably could affect his or her

25   ability to fairly or adequately represent the interests of the

26   absent class members or shareholders.

27        18.   The named plaintiff's attorneys in a class action or

28   shareholder derivative action also owe the absent class members

     or shareholders fiduciary duties.  As a result of these legally

                                      6

1  imposed duties, the named plaintiff's attorneys, among other

2  things: (a) may not give preferential treatment to the interests

3  of the named plaintiff over the interests of the absent class

4  members or shareholders; (b) may not act in a deceitful or

5  unethical manner toward the court or the absent class members or

6  shareholders; and (c) are required to disclose to the court any

7  fact that reasonably could affect the attorneys' ability to

8  fairly or adequately represent the interests of the absent class

9  members or shareholders.

10  **D.    Court Approval of Settlements and Awards of**
      **Attorneys' Fees**

11

12  19.    Courts presiding over class actions or shareholder

13  derivative actions are obligated to protect the rights and

14  interests of the absent class members or shareholders.  As a

15  result, a presiding court is required to scrutinize any proposed

16  settlement of a class action or shareholder derivative action and

17  may approve such a settlement only if the court first determines

18  that the settlement is fair to absent class members or

19  shareholders.

20  20.    The named plaintiff's attorneys in class actions often

21  seek to obtain their attorneys' fees from the recovery obtained

22  for the class in the lawsuit; in shareholder derivative actions

23  they often seek to obtain their attorneys' fees from the

24  corporation.  The attorneys' fees in such instances are paid,

25  directly or indirectly, from proceeds that otherwise would be

26  available to the absent class members or shareholders.  Courts

27  presiding over class actions or shareholder derivative actions

28  are obligated, on behalf of the absent class members or

   shareholders, to scrutinize any request for attorneys' fees to

1  ensure its fairness and reasonableness. Consistent with their
2  fiduciary duties, the named plaintiff's attorneys are required,
3  as part of any request for attorneys' fees, to disclose to the
4  court all facts that reasonably could bear on their entitlement
5  to the requested fees.

6       **E.**    **Limitations on Compensation of Named Plaintiffs**

7      21. The compensation that may be paid to a named plaintiff
8  in a class action or shareholder derivative action is limited to
9  the following: (a) the named plaintiff's pro rata share of the
10  recovery obtained in the lawsuit, calculated on the same basis as
11  the pro rata shares available to all of the absent class members
12  or shareholders; and (b) his or her reasonable costs and expenses
13  incurred in connection with the lawsuit, as approved by the
14  court. Additionally, in some circumstances, the court presiding
15  over such a lawsuit may award a modest bonus payment to the named
16  plaintiff, in recognition of his or her effort in obtaining a
17  beneficial result for the absent class members or shareholders.
18  Such a bonus payment may be awarded only if it is first disclosed
19  to absent class members or shareholders, and only after the
20  absent class members or shareholders have an opportunity to
21  object to the bonus award.

22      22. Because a named plaintiff acts as a fiduciary toward
23  absent class members or shareholders and is required to remain
24  free of any material conflict of interest toward them, the named
25  plaintiff may not have any financial interest in the outcome of a
26  class action or shareholder derivative action lawsuit other than
27  those described above.

28  / / /

**IV.  DEFENDANTS' SECRET AND ILLEGAL KICKBACK SCHEME IN CLASS ACTIONS AND SHAREHOLDER DERIVATIVE ACTIONS**

23.  During the time relevant to this Indictment, MILBERG WEISS brought numerous class actions and shareholder derivative actions against publicly traded companies and other major businesses.  These lawsuits generated hundreds of millions of dollars in attorneys' fees and partnership profits for MILBERG WEISS and WEISS.  To bring these lawsuits, MILBERG WEISS and WEISS needed persons who would agree to serve as named plaintiffs and whom the courts would likely approve to represent absent class members or shareholders.

24.  Beginning in or before 1979 and continuing through at least in or about 2005, in order to facilitate the recruitment of named plaintiffs, defendants MILBERG WEISS and WEISS, together with Lerach, Bershad, Schulman, Partner E, Partner F, and Partner G (collectively the "Conspiring Partners"), agreed to and did secretly pay kickbacks to named plaintiffs in class actions and shareholder derivative actions in which MILBERG WEISS served as counsel.  Specifically, they agreed to and did pay to certain named plaintiffs a substantial portion of the attorneys' fees MILBERG WEISS obtained in actions in which such an individual served, or caused a relative or associate to serve, as a named plaintiff for MILBERG WEISS.

25.  Included among the individuals who served as named plaintiffs for MILBERG WEISS pursuant to the kickback scheme described above are defendant LAZAR; Vogel; Cooperman and two of his associates, Cooperman Plaintiff 1 and Cooperman Plaintiff 2; and the Florida Plaintiffs.  These individuals are each referred to as a "Paid Plaintiff," and collectively as the "Paid

1  Plaintiffs."  The class actions and shareholder derivative

2  actions in which the Paid Plaintiffs served, or caused their

3  spouses or entities they controlled to serve, as named plaintiffs

4  for MILBERG WEISS pursuant to the kickback scheme described above

5  are referred to as the "Lawsuits."

6      26.  During the times relevant to this Indictment, these

7  kickback arrangements with and kickback payments to the Paid

8  Plaintiffs were illegal and improper for the following reasons,

9  among others: (a) under applicable New York law, it is a criminal

10  offense for an attorney to promise or give anything of value to

11  induce a person to bring a lawsuit, or to reward a person for

12  having done so; (b) under applicable New York law, it is a

13  criminal offense to pay a fiduciary, without the consent of those

14  to whom he or she owes fiduciary duties, with the intent to

15  influence his or her conduct as a fiduciary; and (c) under

16  applicable New York and California laws, lawyers may not share

17  attorneys' fees with persons who are not duly licensed to

18  practice law.  Additionally, the kickback arrangements created a

19  conflict of interest between the Paid Plaintiffs and those to

20  whom they owed fiduciary duties because, as a result of the

21  kickback arrangements, the Paid Plaintiffs had a greater interest

22  in maximizing the amount of attorneys' fees awarded to

23  MILBERG WEISS than in maximizing the net recovery to the absent

24  class members and shareholders.

25      27.  To conceal their illegal kickback arrangements from the

26  courts presiding over the Lawsuits, the other parties to the

27  Lawsuits, and the absent class members and shareholders whose

28  interests they purported to represent in the Lawsuits,

1  MILBERG WEISS, WEISS, LAZAR, the other Conspiring Partners, the

2  other Paid Plaintiffs, and others engaged and caused others to

3  engage in various fraudulent and deceptive acts, practices, and

4  devices.  Among other things, they made and caused others to make

5  false and misleading statements, and omitted and caused others to

6  omit material facts, in complaints, motions, certifications,

7  declarations, and other documents filed in the Lawsuits, and in

8  depositions and other discovery of the Paid Plaintiffs taken in

9  the Lawsuits.  Additionally, MILBERG WEISS, WEISS, the other

10  Conspiring Partners, and others concealed and disguised the

11  illegal kickbacks by, among other things, paying the kickbacks to

12  Paid Plaintiffs in cash and through intermediary law firms and

13  lawyers selected by Paid Plaintiffs (hereinafter the

14  "Intermediary Lawyers"), who then used and disbursed the payments

15  at the direction, and for the benefit, of the Paid Plaintiffs.

16        28.  The Intermediary Lawyers included: (a) SELZER, the

17  Palm Springs Law Firm, the Selzer Law Firm, other attorneys and

18  their associated law firms in Los Angeles, California ("Lazar

19  Intermediary A"), Portland, Oregon ("Lazar Intermediary B"),

20  Santa Ana, California ("Lazar Intermediary C"), and Wichita,

21  Kansas ("Lazar Intermediary D"), and a Los Angeles entertainment

22  lawyer ("Lazar Intermediary E"), all of whom acted as

23  intermediary lawyers for LAZAR; (b) attorneys in Denver, Colorado

24  and New York, New York, and their associated law firms ("Vogel

25  Intermediary A" and "Vogel Intermediary B," respectively), who

26  acted as intermediary lawyers for Vogel; and (c) Richard Purtich

27  and his associated law firms ("Purtich") and James Tierney

28  ("Tierney"), who acted as intermediary lawyers for Cooperman.

1     29.   The concealment of the secret and illegal kickback

2   arrangements and payments from the courts presiding over the

3   Lawsuits influenced, obstructed, and impeded the ability of those

4   courts to assess and determine: (a) the appropriateness of

5   approving the Lawsuits to proceed as class actions or shareholder

6   derivative actions; (b) the ability of the Paid Plaintiffs, their

7   spouses, and the entities they controlled to fairly and

8   adequately represent the interests of the absent class members or

9   shareholders; (c) the ability of MILBERG WEISS, WEISS, and the

10   other Conspiring Partners to fairly and adequately represent the

11   interests of the absent class members or shareholders; (d) the

12   fairness of settlements proposed by MILBERG WEISS, WEISS, the

13   other Conspiring Partners, and the Paid Plaintiffs in the

14   Lawsuits; and (e) whether and the extent to which MILBERG WEISS

15   should be awarded the attorneys' fees sought in the Lawsuits.

16     30.   The concealment of the secret and illegal kickback

17   arrangements and payments also deprived the absent class members

18   and shareholders in each of the Lawsuits of:

19        (a) the honest services of MILBERG WEISS, WEISS, LAZAR,

20   the other Conspiring Partners, and the other Paid Plaintiffs,

21   including: (i) the services of a named plaintiff who was free

22   from any conflict of interest that might impair his or her

23   ability to fairly and adequately represent their interests;

24   (ii) the services of attorneys who were able to fairly and

25   adequately represent their interests without preference to the

26   interests of a named plaintiff; and (iii) the services of a named

27   plaintiff and attorneys who would not act in a deceitful,

28   unethical, or unlawful manner toward them or the court;

1        (b) material economic information that affected their

2  right and ability to influence and control class actions and

3  shareholder derivative actions brought on their behalf; and

4        (c) the amount of any kickback that MILBERG WEISS paid

5  using attorneys' fees obtained in the Lawsuit.

6  **V.    SUMMARY OF KICKBACK PAYMENTS**

7     31.  Beginning in or before 1976 and continuing through at

8  least in or about 2004, LAZAR served, and caused his relatives

9  and an entity he controlled to serve, as named plaintiffs in

10  approximately sixty-seven lawsuits for MILBERG WEISS.  In total,

11  MILBERG WEISS, WEISS, and others made and caused to be made

12  approximately $2.6 million in secret and illegal kickback

13  payments for the benefit of LAZAR.

14     32.  Beginning in or about 1991 and continuing through at

15  least in or about 2005, Vogel served, and caused his relatives

16  and an entity he controlled to serve, as named plaintiffs in

17  approximately forty lawsuits for MILBERG WEISS.  In total,

18  MILBERG WEISS, WEISS, and others made and caused to be made

19  approximately $2.5 million in secret and illegal kickback

20  payments for the benefit of Vogel.

21     33.  Beginning in or about 1988 and continuing through at

22  least in or about 1999, Cooperman served, and caused his

23  relatives and associates to serve, as named plaintiffs in

24  approximately seventy lawsuits for MILBERG WEISS.  In total,

25  MILBERG WEISS, WEISS, and others made and caused to be made more

26  than $6.2 million in secret and illegal kickback payments for the

27  benefit of Cooperman, Cooperman Plaintiff 1, and Cooperman

28  Plaintiff 2.

1       34.   Beginning in or before 1983 and continuing through at

2   least in or about 1999, the Florida Plaintiffs served as named

3   plaintiffs in more than approximately 60 lawsuits for MILBERG

4   WEISS.  In total, MILBERG WEISS, WEISS, and others paid and

5   caused to be paid hundreds of thousands of dollars in cash to the

6   Florida Plaintiffs.

7       35.   During the period from 1979 through 2005, MILBERG WEISS

8   obtained more than $ 251 million in attorneys' fees in the

9   Lawsuits and litigation resolving the Lawsuits and, together with

10   WEISS and others, paid and caused to be paid more than

11   approximately $11.3 million in secret and illegal kickbacks to

12   LAZAR, Vogel, and Cooperman.  Additionally, MILBERG WEISS, WEISS,

13   and others paid the Florida Plaintiffs hundreds of thousands of

14   dollars in cash kickbacks.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT ONE

[Defendants MILBERG WEISS, WEISS, and LAZAR]

[18 U.S.C. § 371]

[Conspiracy]

36.   The Grand Jury hereby repeats and realleges paragraphs 1 through 35 of this Indictment.

I.   **THE OBJECTS OF THE CONSPIRACY**

37.   Beginning in or before 1979, and continuing through at least in or about 2005, within the Central District of California and elsewhere, defendants MILBERG WEISS, MELVYN I. WEISS, and SEYMOUR M. LAZAR, together with the other Conspiring Partners, the other Paid Plaintiffs, and other persons known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit the following offenses against the United States:

        a.   to commit obstruction of justice by corruptly influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due administration of justice in the Lawsuits filed and litigated in federal courts, in violation of Title 18, United States Code, Section 1503;

        b.   to make false material declarations under oath in proceedings before and ancillary to courts of the United States, in connection with the Lawsuits filed and litigated in federal courts, in violation of Title 18, United States Code, Section 1623(a);

        c.   to travel in interstate commerce and to use the mail and other facilities in interstate commerce with intent to distribute the proceeds of unlawful activity and otherwise to facilitate the promotion, management, and carrying on of such

15

1 unlawful activity, namely, commercial bribery of the

2 Paid Plaintiffs, in violation of New York Penal Law

3 Section 180.00, and thereafter to perform and attempt to perform

4 acts to distribute the proceeds of such unlawful activity and to

5 facilitate the promotion, management, and carrying on of such

6 activity, in violation of Title 18, United States Code,

7 Section 1952(a)(1), (3).

8      d.   to commit mail fraud by using the United States

9 mails and commercial interstate carriers to execute a scheme to

10 defraud absent class members and shareholders in the Lawsuits as

11 to a material matter, by depriving them of money and property and

12 the honest services of MILBERG WEISS, WEISS, LAZAR, the other

13 Paid Plaintiffs, and others, and to obtain money and property by

14 means of material false and fraudulent pretenses,

15 representations, and promises, in violation of Title 18, United

16 States Code, Sections 1341 and 1346;

17      e.   to commit wire fraud by using interstate wire and

18 radio communications to execute a scheme to defraud absent class

19 members and shareholders in the Lawsuits as to a material matter,

20 by depriving them of money and property and the honest services

21 of MILBERG WEISS, WEISS, LAZAR, the other Paid Plaintiffs, and

22 others, and to obtain money and property by means of material

23 false and fraudulent pretenses, representations, and promises, in

24 violation of Title 18, United States Code, Sections 1343 and

25 1346; and

26      f.   to make illegal payments to a witness by giving,

27 offering, and promising money to the Paid Plaintiffs, for and

28 because of the testimony under oath or affirmation given and to

1  be given by the Paid Plaintiffs as a witness upon a trial,

2  hearing, or other proceeding before a court authorized by the

3  laws of the United States to hear evidence or take testimony in

4  the Lawsuits, filed or litigated in federal courts, in violation

5  of Title 18, United States Code, Section 201(c)(2).

6  **II.   MANNER AND MEANS OF THE CONSPIRACY**

7      38.   The objects of the conspiracy were carried out in the

8  manner and by the means described below, among others.

9      39.   MILBERG WEISS, WEISS, the other Conspiring Partners,

10  and others arranged for the Paid Plaintiffs to serve, and to

11  cause relatives and associates to serve, as named plaintiffs in

12  class actions and shareholder derivative actions in which

13  MILBERG WEISS served as counsel.

14      40.   As an inducement to the Paid Plaintiffs to serve, and

15  to induce them to cause relatives and associates to serve, as

16  named plaintiffs, MILBERG WEISS, WEISS, the other Conspiring

17  Partners, and others offered, promised, and agreed secretly to

18  pay the Paid Plaintiffs kickbacks consisting of a portion of the

19  attorneys' fees that MILBERG WEISS expected to obtain in each

20  action in which the respective Paid Plaintiff served, or caused a

21  relative or associate to serve, as a named plaintiff.

22      41.   In the course of the Lawsuits, MILBERG WEISS, WEISS,

23  LAZAR, the other Conspiring Partners, the other Paid Plaintiffs,

24  and others engaged in, and caused each other to engage in,

25  various fraudulent and deceptive acts, practices, and devices,

26  including the following:

27          a.   MILBERG WEISS, WEISS, LAZAR, the other Conspiring

28  Partners, the other Paid Plaintiffs, and others concealed their

17

1  illegal kickback arrangements from the courts presiding over, the

2  other parties to, and the absent class members and shareholders

3  in the Lawsuits;

4        b.    MILBERG WEISS, WEISS, LAZAR, the other Conspiring

5  Partners, other Paid Plaintiffs, and others made and caused to be

6  made false and misleading representations in: (i) complaints to

7  initiate and maintain the Lawsuits; (ii) motions seeking court

8  approval for the Lawsuits to proceed as class actions or

9  shareholder derivative actions; and (iii) motions seeking court

10 approval of MILBERG WEISS and the Paid Plaintiffs or their

11 spouses or entities they controlled to represent absent class

12 members or shareholders in the Lawsuits.  Specifically, they

13 caused to be represented in these pleadings that the Paid

14 Plaintiffs or their spouses or entities they controlled had no

15 interest in conflict with, or antagonistic to, absent class

16 members or shareholders in the Lawsuits, and that MILBERG WEISS

17 and the Paid Plaintiffs or their spouses or associated entities

18 would fairly and adequately represent their interests.  In truth

19 and in fact, as MILBERG WEISS, WEISS, LAZAR, the other Conspiring

20 Partners, the other Paid Plaintiffs, and others well knew, the

21 interests of the Paid Plaintiffs, their spouses, or entities they

22 controlled conflicted with those of absent class members or

23 shareholders because, as a result of their secret and illegal

24 kickback arrangements, they had a greater interest in maximizing

25 the amount of attorneys' fees awarded to MILBERG WEISS than in

26 maximizing the net recovery to the absent class members or

27 shareholders.  Additionally, as a result of the secret and

28 illegal kickback arrangements, MILBERG WEISS, WEISS, and the

1  other Conspiring Partners improperly favored the financial

2  interests of the Paid Plaintiffs or their spouses or associated

3  entities over the interests of the absent class members or

4  shareholders.

5          c.    In under-oath testimony given in connection with

6  the Lawsuits and in written certifications, declarations, and

7  other documents signed under penalty of perjury in the Lawsuits,

8  LAZAR and other Paid Plaintiffs, acting in concert with

9  MILBERG WEISS, WEISS, the other Conspiring Partners, and others,

10  falsely denied that they had ever received, or expected to

11  receive, any payment for serving as a named plaintiff other than

12  their pro rata share of the recovery based on the same terms as

13  the pro rata shares available to all of the absent class members

14  or shareholders.  In truth and in fact, as MILBERG WEISS, WEISS,

15  LAZAR, the other Conspiring Partners, the other Paid Plaintiffs,

16  and others well knew, in return for serving as named plaintiffs

17  the Paid Plaintiffs had received and expected to receive kickback

18  payments from MILBERG WEISS that substantially exceeded any pro

19  rata share of the recovery they received, or could expect to

20  receive, based on the terms used to determine the pro rata shares

21  available to all of the absent class members or shareholders in

22  the Lawsuits.

23          d.    MILBERG WEISS, WEISS, LAZAR, the other Conspiring

24  Partners, the other Paid Plaintiffs, and others caused the

25  Lawsuits to be settled in a manner that often would generate

26  substantial attorneys' fees for MILBERG WEISS, while concealing

27  from the courts approving these settlements, and from the absent

28  class members or shareholders on whose behalf the settlements

1  were being negotiated, their secret and illegal kickback

2  arrangements.

3       e.   MILBERG WEISS, WEISS, LAZAR, the other Conspiring

4  Partners, the other Paid Plaintiffs, and others caused to be

5  filed motions in the Lawsuits seeking the awards of attorneys'

6  fees to MILBERG WEISS, in which they concealed from the courts

7  awarding attorneys' fees, and the absent class members or

8  shareholders, their illegal kickback arrangements under which the

9  awarded attorneys' fees secretly would be shared with the Paid

10 Plaintiffs.

11      42.  In the course of certain of the securities fraud class

12 action Lawsuits, MILBERG WEISS, Vogel, Cooperman Plaintiff 1,

13 Cooperman Plaintiff 2, certain of the Conspiring Partners, and

14 others engaged in, and caused each other to engage in, additional

15 fraudulent and deceptive acts, practices, and devices, including

16 the following:

17      a.   MILBERG WEISS and certain of the Conspiring

18 Partners falsely represented and caused to be falsely represented

19 in complaints and other pleadings filed in such Lawsuits that the

20 Paid Plaintiffs' claims were typical of the claims of the members

21 of the class and that the Paid Plaintiffs relied on the allegedly

22 false and misleading statements made by the defendants in the

23 Lawsuits when purchasing the securities at issue in the Lawsuits.

24 In truth and in fact, as they well knew, the Paid Plaintiffs'

25 claims in such Lawsuits were not typical of the claims of the

26 class members.  Unlike the other class members in the Lawsuits,

27 the Paid Plaintiffs purchased the securities at issue

28 anticipating that the securities would decline in value, in order

1   to position themselves to be named plaintiffs in securities fraud
2   class actions and to obtain kickback payments from MILBERG WEISS.
3         b.    In under-oath testimony given in connection with
4   such Lawsuits and in written certifications, declarations, and
5   other documents signed under penalty of perjury in such Lawsuits,
6   Vogel, Cooperman Plaintiff 1, Cooperman Plaintiff 2, and other
7   Paid Plaintiffs, acting in concert with MILBERG WEISS, certain of
8   the Conspiring Partners, and others, falsely denied that they
9   purchased the securities at issue in the Lawsuits in order to be
10  named plaintiffs.    In truth and in fact, as they well knew, these
11  Paid Plaintiffs purchased the securities at issue in order to
12  position themselves to be named plaintiffs in securities fraud
13  class actions and to obtain kickback payments from MILBERG WEISS.
14        43.    After the court in a Lawsuit awarded attorneys' fees,
15  or was expected to award attorneys' fees, MILBERG WEISS, WEISS,
16  the other Conspiring Partners, and others arranged for the secret
17  and illegal kickbacks to be paid to the Paid Plaintiffs.    To
18  conceal and disguise these kickback payments, among other things,
19  MILBERG WEISS, WEISS, and other of the Conspiring Partners made
20  and caused kickback payments to be made: (a) in cash given
21  directly to the Paid Plaintiffs; and (b) by MILBERG WEISS checks
22  payable to the Intermediary Lawyers or other professionals
23  selected by the Paid Plaintiffs, who then used and disbursed the
24  payments at the direction, and for the benefit, of the Paid
25  Plaintiffs.    Additionally, MILBERG WEISS, WEISS, and other of the
26  Conspiring Partners made and caused to be made other payments at
27  the direction and for the benefit of LAZAR, including a $250,000
28  payment to LAZAR's son and a regular monthly payment to LAZAR's

1  friend.

2    44.  Regarding the kickbacks paid to the Paid Plaintiffs in

3  cash:

4        a.  Bershad regularly collected cash to be used to pay

5  plaintiffs and others from WEISS and other senior partners in

6  MILBERG WEISS, including Lerach, Partner F, and Partner G;

7        b.  WEISS, Bershad, and others obtained and caused to

8  be obtained the cash in a manner that made the source of the

9  payments difficult to trace, including from casinos;

10       c.  Bershad, acting in concert with WEISS and others,

11  kept the collected cash in a safe located in a credenza in his

12  office at MILBERG WEISS;

13       d.  In the earlier years of the conspiracy, Bershad

14  attempted to collect cash from the other Conspiring Partners in

15  proportion to their partnership interest in MILBERG WEISS;

16       e.  On or about January 1, 1986, WEISS, Lerach,

17  Bershad, and other of the Conspiring Partners caused a provision

18  to be included in MILBERG WEISS's written partnership agreement

19  that, among other things, enabled them to use MILBERG WEISS

20  profits to compensate themselves for the cash they had

21  contributed to pay plaintiffs and others;

22       f.  WEISS, Lerach, Bershad, and the other Conspiring

23  Partners failed to record their cash contributions or the cash

24  payments in MILBERG WEISS's accounting books and records.

25    45.  Regarding the kickbacks paid by MILBERG WEISS checks

26  made payable to the Intermediary Lawyers or other professionals

27  selected by Paid Plaintiffs:

28  / / /

22

1       a.   MILBERG WEISS, WEISS, Bershad, the other
2  Conspiring Partners, and others caused such payments to be
3  falsely characterized in MILBERG WEISS's accounting books and
4  records as, among other things, referral fees, professional fees,
5  and "fees to others" paid to the Intermediary Lawyers or other
6  professionals;

7       b.   MILBERG WEISS, Bershad, Schulman, Partner E, and
8  others falsely characterized such payments in accompanying cover
9  letters as, among other things: the Intermediary Lawyer's
10  "entitlement" for work and responsibility "assumed" in a Lawsuit;
11  the Intermediary Lawyer's "share" of attorneys' fees for "work,
12  services, and joint representation" of a Paid Plaintiff in a
13  Lawsuit; "referral" fees earned by the Intermediary Lawyer in a
14  Lawsuit; the Intermediary Lawyer's "participation" in
15  MILBERG WEISS's fee award in a Lawsuit; or made "on account of
16  cases" that MILBERG WEISS was "doing" with the Intermediary
17  Lawyer or other professional;

18       c.   MILBERG WEISS, Bershad, and others provided and
19  caused to be provided false and misleading information to
20  MILBERG WEISS's outside accountants and tax return preparers
21  concerning such payments, which helped to disguise them as
22  legitimate fees paid for the benefit of the Intermediary Lawyers
23  and other professionals, rather than as illegal kickback payments
24  for the benefit of the Paid Plaintiffs; and

25       d.   MILBERG WEISS and others issued and caused to be
26  issued IRS Forms 1099-MISC to the Intermediary Lawyers, which
27  made it appear as if such payments were legal referral fees for
28  the benefit of the Intermediary Lawyers.

23

1    46.   After an Intermediary Lawyer or other professional

2   received a kickback payment from MILBERG WEISS, the

3   Paid Plaintiff directed the Intermediary Lawyer or other

4   professional to use and apply such kickback payment for the

5   benefit of the Paid Plaintiff including, among other things:

6   (a) to make a payment directly to the Paid Plaintiff; (b) to

7   satisfy legal fees or expenses that the Paid Plaintiff owed or

8   would owe to the Intermediary Lawyer; and (c) to pay third

9   parties to whom the Paid Plaintiff owed money.

10  **III. OVERT ACTS**

11    47.   In furtherance of the conspiracy and to accomplish its

12  objects, defendants MILBERG WEISS, WEISS, and LAZAR, together

13  with the other Conspiring Partners, the other Paid Plaintiffs,

14  and others known and unknown to the Grand Jury, committed and

15  willfully caused others to commit the following overt acts, among

16  others, in the Central District of California and elsewhere.

17    Overt Act No. 1: In or about August 1979, WEISS told

18  Bershad that WEISS had entered into an arrangement with LAZAR by

19  which MILBERG WEISS was to pay LAZAR 10% of its attorneys' fees

20  in LAZAR's cases, and would make such payment to any intermediary

21  designated by LAZAR.

22    Overt Act No. 2: In or about the early 1980s, after

23  Bershad told WEISS and Partner F that paying Florida Plaintiff 1

24  would violate the laws prohibiting an attorney from paying

25  someone to induce him or her to bring a lawsuit, WEISS and

26  Partner F replied, among other things, that because they would be

27  paying Florida Plaintiff 1 in cash, there would be no paper trail

28  and therefore there was little risk they would ever be caught.

24

1        Overt Act No. 3: On or about September 11, 1981, during

2    an under-oath deposition taken in the Lawsuit Seymour Lazar v.

3    Hertz Corp., Civ. No. 461200 (San Diego County, California,

4    Superior Court) ("Hertz"), LAZAR falsely denied that he had any

5    agreement with MILBERG WEISS to receive any compensation beyond

6    his pro rata share of the recovery available to all members of

7    the class.

8        Overt Act No. 4: On or about March 1, 1982, in support

9    of a request that the court certify the Lawsuit Seymour Lazar et

10   al. v. Arcata Corp., et al., Civ. No. 257916 (San Mateo County,

11   California, Superior Court) ("Arcata") as a class action, LAZAR

12   falsely represented, under penalty of perjury, that he had "no

13   agreement or understanding to share in the legal fees, if any,

14   that are awarded to [MILBERG WEISS]."

15       Overt Act No. 5: On or about February 1, 1984, during

16   an under-oath deposition taken in the Lawsuit Seymour Lazar v.

17   Unity Buying Service Co., Civ. No. 511287 (San Diego County,

18   California, Superior Court) ("Unity Buying"), LAZAR falsely

19   denied that he contemplated sharing in any award of attorneys'

20   fees in Unity Buying or Arcata.

21       Overt Act No. 6: On or about January 30, 1985, in the

22   Lawsuit Seymour Lazar v. James D. Sadlier, et al., CV 84-8100-WJR

23   (United States District Court, Central District of California)

24   ("Arrays"), MILBERG WEISS and others caused to be filed with the

25   court a memorandum in support of a request that the court certify

26   Arrays as a class action, in which they falsely represented that

27   LAZAR's interests in the Lawsuit were "congruent with and not in

28   conflict with those of the members of the class."

1      Overt Act No. 7: On or about March 12, 1985, during an

2  under-oath deposition in Arrays, LAZAR falsely testified that he

3  had "never, ever received any sums from [MILBERG WEISS]

4  whatsoever," and falsely denied that he had "any arrangement"

5  with MILBERG WEISS under which he was "to receive or might

6  anticipate receiving any of the award in [Arrays] aside from

7  [his] own personal recovery as a plaintiff."

8      Overt Act No. 8: On or about December 11, 1985,

9  MILBERG WEISS and others caused to be filed with the court an

10  amended class action complaint in the Lawsuit In re Beverly Hills

11  Savings and Loan Ass'n Securities Litigation, No. CV 85-2702-RMT

12  (United States District Court, Central District of California)

13  ("Beverly Hills Savings"), naming LAZAR as a plaintiff, in which

14  they falsely represented, among other things, that LAZAR had "no

15  interests which are contrary to or in conflict with" the absent

16  class members.

17      Overt Act No. 9: In or about the mid-1980s, WEISS

18  carried thousands of dollars in cash from New York to

19  Florida Plaintiff 1 and Florida Plaintiff 2 in Florida to

20  compensate them for serving as named plaintiffs for

21  MILBERG WEISS.

22      Overt Act No. 10: On or about January 1, 1986, WEISS,

23  Lerach, Bershad, and other of the Conspiring Partners caused to

24  be included in MILBERG WEISS's first formal partnership agreement

25  a provision that enabled the Conspiring Partners, every year, to

26  use MILBERG WEISS profits to compensate themselves for the cash

27  they had each contributed that year to pay plaintiffs and others.

28

1      Overt Act No. 11: On or about June 19, 1986, during an

2   under-oath deposition in Beverly Hills Savings, LAZAR falsely

3   testified that he had no understanding by which he would receive

4   "any monetary advantage or any monetary sum" other than his pro

5   rata share of the recovery available to all plaintiffs in the

6   lawsuit.

7      Overt Act No. 12: On or about June 29, 1987, at LAZAR's

8   direction, WEISS and Bershad caused MILBERG WEISS to send Selzer

9   and the Palm Springs Law Firm a $50,000 check, with a cover

10  letter falsely describing the payment as fees to Selzer and the

11  Palm Springs Law Firm "in furtherance of arrangements made" with

12  regard to the Lawsuit "Lazar v. British Petroleum."

13     Overt Act No. 13: In or about December 1987, WEISS

14  caused MILBERG WEISS to pay him approximately $90,000 to

15  compensate him for having contributed cash during the year 1987

16  used to pay plaintiffs and others.

17     Overt Act No. 14: Between in or about April and

18  November 1988, Lerach told Cooperman that MILBERG WEISS would pay

19  him and Cooperman Plaintiff 1 a percentage of MILBERG WEISS's fee

20  in the Lawsuit Steven Cooperman, et al. v. The Newhall Land and

21  Farming Co., No. CA001093 (Los Angeles County, California,

22  Superior Court) (related to Steven Cooperman, et al. v. The

23  Newhall Land and Farming Co., No. CV 88-3137-FW (United States

24  District Court, Central District of California)) (collectively

25  "Newhall Land"), the first case in which Cooperman and Cooperman

26  Plaintiff 1 served as plaintiffs for MILBERG WEISS.

27     Overt Act No. 15: On or about November 3, 1988,

28  MILBERG WEISS and others caused to be filed with the court a

1 sworn affidavit in support of a request that the court certify
2 the Lawsuit A. Jacques Lou v. Ashland Oil, Inc., et al., No. 86
3 Civ. 5304 (RWJ) (United States District Court, Southern District
4 of New York) ("Ashland Oil") as a class action, in which they
5 falsely represented that LAZAR's wife, who was a named plaintiff
6 in the action, had "no conflict of interest" with "the other
7 investors whom plaintiff seeks to represent."

8      Overt Act No. 16: In or about December 1988, WEISS
9 caused MILBERG WEISS to pay him approximately $107,000 to
10 compensate him for having contributed cash during the year 1988
11 used to pay plaintiffs and others.

12      Overt Act No. 17: In or about late 1988, Cooperman told
13 Lerach that he wanted to be paid his share of MILBERG WEISS's
14 attorneys' fees in Newhall Land quickly.

15      Overt Act No. 18: In or about early 1989, Lerach told
16 Cooperman and Cooperman Plaintiff 1 that they would receive
17 approximately 5% to 10% of MILBERG WEISS's attorneys' fees in
18 Newhall Land; that MILBERG WEISS would pay Cooperman and
19 Cooperman Plaintiff 1 5% to 10% of MILBERG WEISS's attorneys'
20 fees in future cases that they brought to the firm; and that
21 Cooperman and Cooperman Plaintiff 1 should purchase stocks in
22 companies in order to position them and MILBERG WEISS to file
23 lawsuits in the future.

24      Overt Act No. 19: In or about early 1989, WEISS,
25 Lerach, and Bershad agreed that WEISS would pay Cooperman for
26 having served as a plaintiff in Newhall Land by disguising the
27 payment as a refundable option on a painting Cooperman owned.

28

1    <u>Overt Act No. 20</u>: On or about January 24, 1989, WEISS

2    traveled from New York to Los Angeles, intending to pay Cooperman

3    the phony art option payment described in Overt Act No. 19.

4        <u>Overt Act No. 21</u>: On or about January 27, 1989, WEISS

5    gave Cooperman a personal check in the amount of $175,000,

6    disguised as a phony refundable option payment on Cooperman's

7    Picasso, "Reclining Nude" (1932).

8        <u>Overt Act No. 22</u>: Thereafter, in or about early 1989,

9    Cooperman paid Cooperman Plaintiff 1 his share of the $175,000

10   kickback proceeds that Cooperman had received from WEISS for

11   serving, with Cooperman Plaintiff 1, as a named plaintiff in

12   <u>Newhall Land</u>.

13       <u>Overt Act No. 23</u>: In or about February 1989, WEISS,

14   Lerach, and Bershad agreed that MILBERG WEISS would pay Cooperman

15   $175,000 through Cooperman's brother-in-law, and Cooperman would

16   use this money to reimburse WEISS for the phony refundable option

17   payment.

18       <u>Overt Act No. 24</u>: On or about March 29, 1989,

19   MILBERG WEISS and others sent to Cooperman's brother-in-law a

20   $35,000 check, with a cover letter falsely describing the payment

21   as Cooperman's brother-in-law's "retainer with work performed and

22   to be performed with regard to [<u>Liberty All-Star</u>]."

23       <u>Overt Act No. 25</u>: On or about April 21, 1989,

24   MILBERG WEISS and others sent to Cooperman's brother-in-law a

25   $25,000 check, purportedly as a "retainer" in a case called

26   "<u>Brinkmann Instruments, Inc.</u>."

27       <u>Overt Act No. 26</u>: On or about May 17, 1989,

28   MILBERG WEISS and others sent to Cooperman's brother-in-law a

29

1 | $40,000 check, purportedly as a "retainer" in a case called "MDC

2 | Corporation."

3 |      Overt Act No. 27: On or about May 19, 1989,

4 | MILBERG WEISS and others sent to Cooperman's brother-in-law a

5 | $40,000 check, purportedly as a "retainer" in a case called

6 | "Imperial Bank."

7 |      Overt Act No. 28: On or about June 14, 1989, Cooperman

8 | sent WEISS a personal check in the amount of $65,000.

9 |      Overt Act No. 29: On or about June 19, 1989, Cooperman

10 | caused his brother-in-law to pay $65,000 of the proceeds of the

11 | MILBERG WEISS checks described in Overt Act Nos. 24-27 to a

12 | company controlled by Cooperman.

13 |      Overt Act No. 30: On or about June 24, 1989, Cooperman

14 | caused his brother-in-law to pay $60,000 of the proceeds of the

15 | MILBERG WEISS checks described in Overt Act Nos. 24-27 to a

16 | company controlled by Cooperman.

17 |      Overt Act No. 31: On or about August 17, 1989,

18 | MILBERG WEISS and others sent to Cooperman's brother-in-law a

19 | $10,000 check, purportedly as a "retainer" in a case called

20 | "Citytrust Litigation."

21 |      Overt Act No. 32: On or about August 18, 1989,

22 | Cooperman sent WEISS a personal check in the amount of $35,000.

23 |      Overt Act No. 33: On or about August 28, 1989,

24 | Cooperman caused his brother-in-law to pay $10,000 of the

25 | proceeds of the MILBERG WEISS checks described in Overt Act

26 | Nos. 24-27 and 31 to a company controlled by Cooperman.

27 |      Overt Act No. 34: On or about September 27, 1989,

28 | Cooperman sent WEISS a personal check in the amount of $25,000,

1  along with a cover letter stating, "I think we're almost there. .
2  . ."

3      Overt Act No. 35: On or about October 24, 1989, in an
4  under-oath deposition in Ashland Oil, MILBERG WEISS, LAZAR, and
5  others caused LAZAR's wife to deny falsely that she had any
6  "financial interest in the outcome of this lawsuit, other than
7  what [she would] receive as damages if [her] individual complaint
8  [was] successful."

9      Overt Act No. 36: On or about November 2, 1989,
10  Cooperman Plaintiff 1 subscribed under penalty of perjury to
11  Answers to Interrogatories in the Lawsuit [Cooperman
12  Plaintiff 1], at al. v. Charles H. Keating Jr., et al.,
13  No. CV 89-2052-SVW (United States District Court, Central
14  District of California) (related to [Cooperman Plaintiff 1], et
15  al. v. Lincoln Savings and Loan Ass'n, et al., No. 90-567-RMB
16  (United States District Court, District of Arizona)) ("American
17  Continental/Lincoln Savings"), which falsely concealed that
18  Lerach had discussed with Cooperman Plaintiff 1 purchasing
19  American Continental stock to position MILBERG WEISS to file a
20  lawsuit.

21      Overt Act No. 37: On or about December 6, 1989,
22  Cooperman sent Lerach a letter describing and enclosing copies of
23  the three checks Cooperman had written to WEISS, described in
24  Overt Act Nos. 28, 32, and 34.

25      Overt Act No. 38: In or about December 1989, WEISS
26  caused MILBERG WEISS to pay him approximately $183,000 to
27  compensate him for having contributed cash during the year 1989
28  used to pay plaintiffs and others.

31

1          Overt Act No. 39: On or about February 8, 1990,

2    MILBERG WEISS and others sent to Cooperman's brother-in-law a

3    $35,000 check, purportedly as a "retainer" in connection with

4    "Lone Star Industries."

5          Overt Act No. 40: On or about February 28, 1990,

6    Cooperman subscribed under penalty of perjury to interrogatory

7    responses in the Lawsuit Steven Cooperman et al. v. Columbia

8    Savings and Loan Ass'n, et al., No. CV 89-6538-SVW (United States

9    District Court, Central District of California

10   ("Columbia Savings"), in which, among other things, he falsely

11   stated in response to a question whether he had any "agreement,

12   arrangement, expectation, intention, or understanding . . . with

13   respect to receiving any payment or consideration different from

14   the payment or consideration that may be received by other

15   members of the putative class as a result of this litigation" the

16   following: "I will not be treated differently than any other

17   class member regarding any recovery."

18         Overt Act No. 41: On or about June 12, 1990,

19   MILBERG WEISS and others sent to Cooperman's brother-in-law a

20   $25,000 check, purportedly as "payment" for his "activities and

21   report" in connection with a case called "Hyatt Union Square

22   Litigation."

23         Overt Act No. 42: On or about June 28, 1990, in an

24   under oath deposition in Columbia Savings, Cooperman concealed

25   his kickback arrangement with MILBERG WEISS.

26         Overt Act No. 43: On or about July 17, 1990, in an

27   under oath deposition in the Lawsuit Steven G. Cooperman v.

28   Fairfield Communities, Inc., et al., No. LR-C-90-464 (United

32

1  States District Court, Eastern District of Arkansas) ("Fairfield
2  Communities"), Cooperman falsely denied that he had received any
3  benefit in connection with Newhall Land other than those paid to
4  all shareholders.

5      Overt Act No. 44: In or about November 1990, Lerach and
6  Bershad asked Cooperman about the status of Cooperman's repayment
7  of the phony art option to WEISS.

8      Overt Act No. 45: On or about November 15, 1990,
9  Cooperman telefaxed to Bershad a note in which he stated:

10         "This is what I've found so far. I faxed Bill copies
       of 3 checks in 12/89 . . . . According to my records, after
11     12/89, Mel sent Bruce another 35,000, & I think I may still
       owe that to Mel."
12

13     Overt Act No. 46: On or about November 16, 1990, in an

    under oath deposition in the Lawsuit Steven Cooperman v. Valley
14
    National Corp., et al., No. CIV 89-1733 PHX (United States
15
    District Court, District of Arizona) (related to Hoexter v.
16
    Simmons, No. CIV 89-1069-RHB (United States District Court,
17
    District of Arizona)) ("Valley National"), Cooperman falsely
18
    denied that he had received any payment for serving as a
19
    plaintiff in the Newhall Land lawsuit and concealed his
20
    expectation that MILBERG WEISS would pay him for being a class
21
    representative in Valley National.
22
       Overt Act No. 47: On or about November 29, 1990,
23
    Cooperman subscribed under penalty of perjury to Answers to
24
    Interrogatories in Fairfield Communities, falsely stating, among
25
    other things, that Cooperman had "at no time received any bonus
26
    or incentive payment as a result of being named as a plaintiff in
27
    any class or derivative actions."
28

1    Overt Act No. 48: On or about March 22, 1991, in an

2    under oath deposition in the Lawsuit Steven G. Cooperman, et al.

3    v. Jan Bell Marketing, Inc., No. 90-6183-Civ-Gonzalez (also known

4    as In re: Jan Bell Marketing Securities Litigation) (United

5    States District Court, Southern District of California) ("Jan

6    Bell"), Cooperman falsely testified, among other things, that in

7    other lawsuits in which he had been a named plaintiff for

8    MILBERG WEISS he had never received any money other than his

9    shareholder portion of the settlements, and that "whatever the

10   court awards as compensation or a judgment," he would "collect

11   [his] share based on how much stock [he] bought."

12    Overt Act No. 49: On or about April 22, 1991, in an

13   under oath deposition in American Continental/Lincoln Savings,

14   Cooperman Plaintiff 1 falsely stated, among other things, that he

15   would not receive any payment from any source in exchange for

16   serving as a named plaintiff in the American Continental/Lincoln

17   Savings lawsuit; and that he did not receive any compensation in

18   Newhall Land beyond that which he received as a member of the

19   class.

20    Overt Act No. 50: On or about April 25, 1991, in a

21   written document that LAZAR verified under penalty of perjury in

22   the Lawsuit Seymour Lazar v. New Image Industries, Inc., et al.,

23   No. CV 90-6345-ER (United States District Court, Central District

24   of California) ("New Image"), MILBERG WEISS and LAZAR falsely

25   represented that LAZAR had never received any compensation from

26   MILBERG WEISS or any of its partners, and that his "claims do not

27   in any manner conflict with, or are . . . antagonistic to, those

28   of the class."

34