EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

CA 04    320 C

| | |
|---|---|
| HOWARD VOGEL, Individually And On Behalf Of All Others Similarly Situated, ) ) ) | CASE NO. |
| Plaintiff, ) ) | |
| vs. ) ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| KVH INDUSTRIES, INC., MARTIN A. KITS VAN HEYNINGEN AND PATRICK J. SPRATT, ) ) ) ) | |
| Defendants. ) ) ) ) | JURY TRIAL DEMANDED |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of regulatory filings and reports, securities analyst reports and advisories about KVH Industries, Inc. ("KVH" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the securities of KVH between October 1, 2003 and July 2, 2004 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      KVH develops, manufactures and markets mobile satellite communications products. At the commencement of the Class Period, defendants announced that they had begun to market the TracVision A5 Antenna (the "Tracvision A5" or "A5") as an affordable device that

would allow consumers to watch television in their minivans, SUVs and other passenger vehicles. Between October 1, 2003 and February 13, 2004, defendants hyped the purported success of the Company's TracVision A5 product launch and claimed that the product would drive the Company's future growth and profitability. They blamed the Company's lackluster performance on other parts of the business and thereby propped up the price of KVH stock until February 13, 2004 when, in an oversubscribed secondary offering, the Company sold 2.75 million KVH shares for $18.75 a share for total proceeds of $51.5 million, thereby increasing its market capitalization by 23%, from $222 million to $273.5 million. For the remainder of the Class Period, the Company continued to make materially false and misleading statements about the purported success of the TracVision A5 product launch even as they were "stuffing the channels" with product that retailers could not sell. The truth emerged on July 2, 2004. On that date, after the close of trading, defendants announced that they were establishing a $2.4 million inventory reserve in connection with A5 antennae for which there was little or no retailer demand and that, in a desperate attempt to move the product, they were reducing the manufacturers' suggested retail price from $3,495 to $2,295 ---- and it was immediately clear to analysts and investors that this would result in margins that would preclude profitability for the A5 for the foreseeable future. On this news, KVH shares, which had closed July 2, 2004 at $12.50 opened for trading at $$9.51 --- a drop of more than 24%.

## JURISDICTION/AND VENUE

3.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j (b) and 78t (a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

2



4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act.

5.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein occurred in substantial part in this District and KVH conducts business in this District.

6.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

7.      Plaintiff Howard Vogel, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of KVH at artificially inflated prices during the Class Period and has been damaged thereby.

8.      Defendant KVH is a Delaware corporation with its principal place of business located at 50 Enterprise Center, Middletown, Rhode Island. KVH develops, manufactures and markets mobile satellite communications products for the automotive, recreational vehicle and marine markets, and navigation, guidance and stabilization for defense markets.

9.      Defendant Martin A. Kits van Heyningen ("Kits van Heyningen") was, at all relevant times, KVH's President, Chief Executive Officer and a director.

10.     Defendant Patrick J. Spratt ("Spratt") was, at all relevant times, KVH's Chief Financial Officer.

11.     Defendants Kits van Heyningen and Spratt are referred to herein as the "Individual Defendants."

3

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of KVH, were privy to confidential and proprietary information concerning KVH, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning KVH, as discussed in detail below. Because of their positions with KVH, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.    The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of KVH's business.

14.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein

4

to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was, and is, registered with the Securities and Exchange Commission (the "SEC") pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to KVH's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of KVH's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants are liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of KVH common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding KVH's business, operations and management and the intrinsic value of KVH common stock, (ii) enabled KVH to complete a secondary offering of more than 2.75 million common shares, at $18.75 per share, for total proceeds of $51.5 million; and (iii) caused plaintiff and members of the Class to purchase KVH common stock at artificially inflated prices.

5

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of KVH between October 1, 2003 and July 2, 2004 inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

18.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, KVH common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by KVH or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

6

21.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of KVH; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

23.    The Class Period commences on October 1, 2003.  On that day, after the market had closed, defendants pre-announced third-quarter revenue of $13.4 million, well below the Company-guided consensus estimate of $15.5 million, but sweetened the bad news with the announcement that they had "successfully" brought the TracVision A5 satellite TV system to market, which was a "major development milestone for the Company."  The Company noted that the associated startup expenses and initial unit production costs were larger than anticipated but maintained that the increased costs were only secondary "contributing factors" to the Company's, at best, breakeven earnings results.  In this regard, the release stated, in pertinent part, as follows:

7



According to Martin Kits van Heyningen, president and chief executive officer, KVH began shipments of its new TracVision A5 satellite TV system to retailers nationwide during the last week of September. *"This is a major development milestone for the company as we have successfully brought this new product to market,"* said Mr. Kits van Heyningen. "TracVision A5 enables KVH to enter the growing automotive multimedia market by offering live satellite TV in cars. *By the end of the quarter, we shipped approximately 150 TracVision A5 units and anticipate shipping 2,000 to 3,000 units in the fourth quarter.* Also at the end of September we significantly expanded our marine market coverage by shipping our new TracVision G8 satellite TV system for larger yachts and commercial vessels."

Preliminary financial results indicate overall third quarter revenues were up approximately 8% to $13.4 million. Chief Financial Officer Pat Spratt said, "Our third quarter earnings per share will be in the range of breakeven to a modest loss - primarily due to lower-than-anticipated military revenues. The end-of-quarter timing of the first TracVision A5 shipments and higher-than-anticipated TracVision A5 startup expenses and initial unit production costs were also contributing factors in these financial results." [Emphasis added.]

24.    The next day, C.E. Unterberg, Towbin published a research report on KVH in which it noted the higher-than-expected startup expenses and early production costs of the TracVision A5 but, taking the Company at its word, stated, in relevant part, "But more important, shipment of the A5 units have begun and the company expects to deliver 2,000 to 3,000 units in Q4." Despite KVH's revenue miss, Towbin maintained a short-term and long-term "buy" rating on the stock and, based on the Company's update, increased its estimates for 2004 TracVision A5 shipments from 9,000 to 10,000 units.

25.    Similarly, WR Hambrecht & Co. maintained its buy rating based on the promise of increasing, high-margin TracVision A5 sales and stated, in this regard, as follows:

*Q4:04 top-line guidance is very positive, as the company expects 2,000-3,000 A5 unit shipments, which makes up for the shortfall in Q0:03. While Q4:03 guidance is soft due to high A5 startup production costs, we expect margins to improve as volumes ramp.*

8



> *Therefore, despite the setback, we maintain our buy rating as we*
> *continue to believe the A5 has the potential to double KVH's*
> *revenue over the next 2-3 years.*  [Emphasis in the original.]

26.     On October 16, 2004, KVH issued a news release over *Business Wire* in which it announced its financial results for its third quarter ended September 30, 2003.  The Company reported a net loss of ($0.16) million, or ($0.01) per share, compared to a net profit of $0.15 million, or $0.01 per diluted share, during the same period the previous year.  Defendants attributed the Company's relatively poor performance to "a delayed military order from an existing customer" and a drop in margins and earnings but claimed that, "Even so, KVH strengthened its competitive and strategic position in each of its markets through new product introductions."  The Company also announced that, on September 24,2003, it had begun retail shipments of the TracVision A5 and that a network of more than 750 retailers locations nationwide would provide sales, installation and support for the TracVision A5.

27.     Commenting on the TracVision A5, defendant Kits van Heyningen stated in the release as follows:

> "The third quarter of this year marked a major strategic
> achievement for KVH as we began shipping our TracVision A5
> satellite TV antenna," Mr. Kits van Heyningen said. "KVH is the
> first company in the world to develop, produce, and ship a low-
> profile in-motion phased array antenna that brings live satellite TV
> to consumers in SUVs and mini-vans nationwide. As the first to
> market, we have an excellent opportunity to secure a strong and
> lasting competitive position in the automotive multimedia market."

28.     Spratt characterized the quarter as "a period of significant transition" with the low level of defense revenue and the introduction of the TracVision A5 presenting some "financial challenges," including increased operating expenses (45% of revenue versus 43% of revenue for

9

the previous third quarter) and attributed the increased costs to "the effect of variable sales and marketing expenses" associated with the startup of the TracVision A5.

29.    Guided by this news release and defendants' statements in a subsequent conference call for analysts, Needham Equity Research issued a positive report on KVH and increased its target price to $30 per share.  The report, stated, in pertinent part, as follows:

> We continue to believe that KVHI's new A5 product remains one of the most exciting product cycles in our coverage universe. *While it's possible there could be more hiccups as the product ramps to substantially higher volumes, the nearly open-ended opportunity for the A5, particularly as its price point drops to more mass market levels, we think makes it a compelling opportunity for KVHI.* The companies' defense business, while perhaps less exciting on immediate basis, also appears to hold substantial short-term promise.  That being said, we recognize that the shares appear expensive on near term revenue and earnings and are likely exhibit substantial volatility with any perceived disappointment.  We would view any such weakness as an opportunity to become more aggressive buyers of the shares. *Our new 12-month price target is $30, or 38 times our unpublished 2005 EPS of $0.80.*
>
> *We were encouraged by the company's commentary on the call with respect to A5 margin expansion, which suggested the A5 would achieve margins equal or above the company's current satellite product margins by 2Q04.* [Emphasis added.]

30.    Raymond James, reacting to the October 17, 2004 news release, stated that, "we remain very bullish on the TracVision A5 opportunity as well as the company's defense products (TACNAV and the newly introduced IMU."), while C.E. Unterburg, Towbin stated, with respect to the purported ramp-up of A5 production and improved profit margins, as follows:

> KVH is building the A5 at a rate of 250 per week and maintains its Q4 target of 2,000 to 3,000 units.  We are at the low-end of that range. *"As production ramps through next year, we expect margins will come in line with KVH's other land mobile satellite products.* [Emphasis added.]

10

31.     On November 4, 2004, defendants published a news release over the *Business Wire* in which they stated that the TracVision A5 had been very well received by retailers and consumers. The release was headlined "Retailers & Customers Praise New KVH TracVision A5 Satellite TV For Automobiles. The release compared the market success of the TracVision A5 to the market success of in-vehicle video screens, which "have become the hottest selling automotive electronic accessory on the market today" and suggested that retailers were selling out their inventory at a rapid clip. In this regard, the release stated, in pertinent part, as follows:

> Breakthrough In-motion Satellite TV System Brings 300+ Channels of Entertainment to a Variety of Vehicles throughout United States
>
> MIDDLETOWN, R.I.--(BUSINESS WIRE)--Nov. 4, 2003--Live satellite TV has come to the automobiles throughout the continental United States as the TracVision A5 satellite TV system from KVH Industries is now available through authorized dealers nationwide. *The groundbreaking TracVision A5 brings satellite television to in-vehicle video screens throughout the country just as mobile video systems have become the hottest selling automotive electronic accessory on the market today.* Retailers and customers alike are offering rave reviews of the TracVision A5's performance, design, and the unmatched variety of entertainment and news now available in cars via satellite. [....]
>
> Customers are also thrilled with the TracVision A5 and receiving live satellite TV on the move. Speaking from his office in Adelanto, CA, Tony Giagnocavo, owner of Western Conveyor, commented on how the TracVision A5 now installed aboard his Cadillac Escalade is getting the attention of people around him. "It seems to catch a lot of people's eyes. I'm sure it will catch the eyes of families with kids in the back."
>
> As for his own use, Mr. Giagnocavo explains, "I use it both for enjoyment and business. It helps to pass the time. When I'm driving alone, I use it to listen to TV programs I enjoy like '60 Minutes'. I've got a TV screen in the back for guests. We're in the high desert, and I've taken it on drives to Arizona and Las Vegas and there have been no problems."

11



*When asked about his customers' interest in the TracVision A5, Mr. Hill at Signature Audio said, "I'm a single store and had no problem ordering 10 TracVision A5 systems right off the bat when I learned about it. My first 10 are already spoken for!"*
[....]

Manufactured by Middletown, RI-based KVH Industries, the TracVision A5 is the first and only low-profile satellite TV antenna designed specifically for use on SUVs, minivans, and similar large passenger vehicles throughout the United States.

In addition to national retailers like Tweeter, retailer/expediters like Freeman's Car Stereo, and 12-volt specialty retailers like Signature Audio, the TracVision A5 is sold through a nationwide network of more than 740 authorized retailers. These retailers are providing complete TracVision A5 sales, installation, and support. Additional information about TracVision A5 and a comprehensive dealer list is available on KVH's web site, www.tracvision.com.

32.    On January 6, 2004, defendants issued a release over the *Business Wire* in which

they announced the Company's preliminary financial results for the Company's fourth quarter

ended December 31, 2003. The Company reported a fourth quarter net loss of ($0.11) – ($0.14)

per share and attributed its poor results to "delays in the military procurement process that have

slowed the arrival of anticipated orders for higher-margin defense products. The Company also

announced that it had shipped only 1,700 TracVision A5 antennas in the quarter, compared to

management's guidance of 2,000 to 3,000, but immediately assured investors that the miss was

due to supply issues that had been resolved, that its cost reduction program and all other aspects

of the rollout were "on track," and that the Company had already begun to turn a profit on the

TracVision A5 antennas. In this regard, the Company stated, in relevant part, as follows:

Commenting on the new TracVision A5 satellite TV system for automobiles, KVH President and Chief Executive Officer Martin Kits van Heyningen said, "The fourth quarter marked the first full quarter of TracVision A5 sales and shipments and during that period we shipped approximately 1,700 TracVision A5 units, which represents roughly 30% of our total estimated satellite communications revenue for the quarter. Already, the TracVision

A5 satellite TV system for automobiles has proven to be the most successful product launch and fastest sales ramp of any product in the company's history."

The number of TracVision A5 units shipped was lower than we had anticipated due in part to production delays resulting from component supply issues early in the quarter," continued Mr. Kits van Heyningen. *"However, I believe those issues have been addressed. Our TracVision A5 cost reduction program is on track and we began to see the gross profit benefit on a per-unit basis at the end of the quarter. All other aspects of the TracVision A5 program, including sales, marketing, distribution, and the expansion of our retailer network, remain on track. Based on the continued market interest and positive, direct consumer feedback from new TracVision A5 owners, we are confident that the TracVision A5 will help drive our future growth and profitability."* [Emphasis added.]

33.    On January 22, 2004, defendants issued a release over the *Business Wire* in which they announced that KVH planned to offer 2.25 million shares of its common stock in a secondary public offering (the "Offering") underwritten by Needham as the sole book-running manager. On February 10, 2004 the Company announced that it was increasing the Offering to 2.75 million shares. The Offering was over-subscribed and, with the 412,500 additional shares sold pursuant to the underwriters over-allotment purchases, raised approximately $51.5. million.

34.    In connection with the Offering, defendants filed a Prospectus with the SEC which stated, in pertinent part, as follows:

In September 2003, we introduced our TracVision A5 low-profile antenna system, which uses our hybrid phased-array antenna technology to provide in-motion satellite TV reception throughout the continental United States in minivans, SUVs and other passenger vehicles using the DIRECTV service. *The product of almost three years of research and development, our TracVision A5 is the first commercially available mobile satellite TV antenna to offer a combination of price, size and performance that makes it practical for use on minivans, SUVs and other passenger vehicles.* We intend to use the TracVision A5 to capitalize on the growing number of video entertainment systems found in these vehicles and the increasing demand for live content.

13

*We sell our TracVision, Tracphone and TracNet mobile satellite communications products through an extensive international network of retailers, distributors and dealers.* [....]

We have successfully used our engineering expertise to achieve ongoing improvements in performance and reductions in the size and cost of our products. We utilized our experience in the development of in-motion satellite tracking antennas for the marine and land mobile markets to develop our TracVision A5 product, the first commercially available low-profile mobile satellite TV antenna for the automotive market. Similarly, we used our extensive experience in fiber optic gyro technology to develop our DSP-3000 product, a new tactical-grade gyroscope that is substantially smaller than any of our prior fiber optic gyro products. We also plan to continue to devote our engineering resources to achieving additional cost reductions in our products, which we believe will enable us to offer our products to larger numbers of consumers at lower prices. [Emphasis added.]

35.     On February 19, 2004, defendants issued a release over the *Business Wire* in which they announced KVH's financial results for the fourth quarter and year ended December 31, 2003. The Company reported a net quarterly loss of ($1.6) million, or ($0.14) per share compared to net income of $0.3 million, or $0.03 per share, during the same period the previous year. The Company reported a net loss of ($1.5) million, or ($0.13) per share, for the fiscal year, equal to a net loss of ($1.5) million, or ($0.13) per share, reported in the prior year. The Company attributed the disappointing results to a delay in receiving a large order from a U.S. military customer and continued to state that the rollout of the TracVision A5 was on track, with TracVision A5 sales comprising 28% of satellite communication revenue for the quarter. With respect to retailer demand for the A5, defendants stated, in pertinent part, as follows:

"While both the fourth quarter and full-year revenues were record highs, they were lower than we had expected primarily as a result of the absence of an anticipated large order from an existing U.S. military customer," explained Martin Kits van Heyningen, KVH's president and chief executive officer. "The absence of this order also contributed significantly to the loss incurred during the fourth quarter. Nevertheless, there is a great deal to be pleased with in the

14

fourth quarter and 2003 as a whole. Over the course of the year, we introduced five new products in our strategic business areas, expanded our penetration in existing markets, successfully penetrated the automotive and precision guidance markets, and achieved significant milestones in our defense business."

"In addition to 50% growth in the marine and RV markets, we also experienced a very positive introduction of the TracVision A5 into the automotive marketplace as we shipped approximately 1,700 units by the end of the year," continued Mr. Kits van Heyningen. *"We fulfilled the channel backlog that had grown during the first three quarters of 2003 in anticipation of the TracVision A5 introduction. Sales of that product represented roughly 28% of our satellite communication revenue for the quarter, making the TracVision A5 new product launch the most successful in KVH history.* We are now focusing our attention on activities that will create broad consumer awareness and support the sell-through in the channel. We are initiating new marketing campaigns, broadening our sales network among car dealerships, exploring partnerships with consumer electronics manufacturers to expand our reach into the mass market, and continuing to develop the potential for the future OEM in-vehicle installation of the product." [....]

With regard to the company's financial results, Pat Spratt, chief financial officer, said, "In the fourth quarter we experienced two operational challenges that were the primary contributors to our weak bottom line results. These were the absence of a large anticipated defense order and the high initial production cost for the TracVision A5. Gross margin for the quarter declined to 29% from 46% in the fourth quarter of 2002. *As we exited the fourth quarter the TracVision A5 product cost had been reduced and we anticipate additional improvement by mid-2004.* We have continued to focus attention on managing operating expenses in relation to revenue growth and we are pleased with the continued improvement in this area." [. . . .]

"Despite the temporary setback on the defense side of our business, I remain confident in our overall business plan and in KVH's position within the marketplace," concluded Mr. Kits van Heyningen. *"Looking ahead, I believe that 2004 will be a strong year for KVH with anticipated revenue growth of approximately 30% to 50%, an expected return to profitability in the first quarter, and strengthened profitability over the course of the year.* [Emphasis added.]

15

36.    On April 22, 2004, defendants issued a release over the *Business Wire* in which they announced the Company's financial results for the first quarter ended March 31, 2004. The Company reported quarterly net income of $0.1 million, or $0.01 per share, compared to net income of $0.2 million, or $0.02 per share, during the same period the previous year.

> Reviewing the status of the company's TracVision A5 low-profile satellite TV system, Mr. Kits van Heyningen explained, "As planned, in the first quarter we largely focused on developing market awareness and consumer pull through our marketing and dealer training programs. ***These efforts helped support our retailers' sell-through of TracVision A5 inventory already in the sales channel.*** New sales to retailers were lower than in Q4 as that initial channel fill was consumed. ***Our recent informal channel checks suggest that there is only limited inventory in the retail channel and we anticipate seeing reorders from the dealer network during the second quarter.*** In response to consumer and retail interest, we have also started to offer the TracVision A5 with a new rooftop mounting system to the RV and motor coach market. This is a natural evolution for our satellite TV antenna technology and allows us to take a step toward our goal of applying our hybrid phased-array antenna across all of our satellite markets. In addition to using our new rooftop mounting system for RVs, we have also started selling the TracVision A5 to several of the country's leading conversion vehicle manufacturers." [Emphasis added.] [ . . . ]

> While we see room for continued improvement on our balance sheet, we believe that the company's fundamentals remain sound and we are confident in our ability to achieve our financial goals for 2004.

37.    The statements set forth above in above in ¶¶23-36 were each materially false and misleading when made, and were known by the KVH Defendants to be false or were recklessly disregarded as such thereby, for the following reasons:

> (a)    The Company had artificially inflated its third and fourth quarter earnings by stuffing the channels with overpriced TracVision A5 systems. Subsequently, the Company was forced to drastically reduce the TracVision A5 systems retail price and to effectively refund millions of dollars in purported sales revenue to its retail dealers in the form of "vendor purchase commitment charges" in order to promote sell-through of TracVision retail channel inventory.

16

(b)    KVH's retail marketing and sales program aimed at the sell-through market for the TracVision A5 were ineffective because the A5 was over-priced, causing the Company to incur additional expenses and higher losses as inventories of unsold TracVision systems in retail channels continued to grow throughout the Class Period

(c)    KVH had not recognized any material cost reduction in the manufacture of the TracVision A5 and would be forced to write-down its inventory of manufactured goods by millions of dollars;

(d)    At the suggested retail price of $3,495, the TracVision A5 was priced too high for its intended market and, therefore, there was no reasonable basis for defendants' projected annual sales of 9,000 to 10,000 units;

(e)    A5 production and related costs were so high that any price reduction would reduce margins such that the A5 could not be sold at a profit;

(f)    The cost reduction program was not on track.  On the contrary, defendants were unable to bring down A5 production and marketing costs;

(g)    Consequently, KVH could not successfully market the Tracvision A5 at any price.

38.    Additionally, the statement in paragraph 31 that "The groundbreaking TracVision A5 brings satellite television to in-vehicle video screens throughout the country just as mobile video systems have become the hottest selling automotive electronic accessory on the market today." was materially false and misleading because the TracVision A5 because it suggests that the A5, like in-vehicle video screens, were hot selling items when defendants knew or recklessly disregarded that the A5 was not even close to being "a hot selling item."

## THE TRUTH EMERGES

39.    The truth emerged on July 2, 2004.  On that date, defendants issued a news release in which they pre-announced financial results for the second quarter ending June 30, 2004.  Defendants stated that the Company would report revenue of between $14.2 million and $14.5 million, "well below our original expectations for the quarter," and a net loss of ($0.34 to

17

($0.37) per share, or $4.9 million to $5.3 million for the quarter. Defendants attributed a portion

of the loss to the establishment of a $2.5 million "inventory valuation reserve" in connection with

the TracVision A5. Defendants further announced that they were reducing the price of the

TracVision A5 to $2,295 from $3,495. In the release the Company claimed that the price

reduction was made possible by defendants' "aggressive manufacturing cost reduction efforts"

and that by lowering the price, the Company would "substantially broaden the market for this

product while maintaining reasonable margins." Investors recognized that the product launch

was inherently flawed, due to the Company's failure to bring production costs down to a level

allowing for the profitable high-volume sales of the product. In a research note, Needham,

KVH's lead underwriter, responded to the Company's release by noting that the price reduction

would preclude the Company from making a profit in the foreseeable future, stating in pertinent

part as follows:

> The company's negative 2Q04 pre-announcement yesterday raised
> new concerns about the profitability of or the A5 for the
> foreseeable future --- *as the planned price reductions will likely
> result in margins that preclude profitability for the A5 for the
> foreseeable future.* ---- while also meaningfully reducing the
> outlook for the company's high-margin military business. [...]
>
> [The company's A5 price reduction] from $3,495 to $2,295 [...]
> will reduce the company's wholesale ASP from about $2,000 to
> about $1,500 and reduce the company's A5 gross margin from
> 40% to 20% for the foreseeable future. While this move *may* help
> stimulate A5 sales, given the considerable

40.    KVH shares had closed at $12.50, the last trading day before the announcement

and, on news of the announcement, opened on July 6, 2004 at $9.51, down 24%.

## UNDISCLOSED ADVERSE INFORMATION

41.    The market for KVH's common stock was open, well-developed and efficient at

all relevant times. As a result of these materially false and misleading statements and failures to

disclose, KVH common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued at least until July 2, 2004. Plaintiff and other members of the Class purchased or otherwise acquired KVH's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to KVH, and have been damaged thereby.

42.  During the Class Period, the KVH Defendants materially misled the investing public, thereby inflating the price of KVH common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the KVH Defendants' statements, as set forth herein not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

43.  At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, the KVH Defendants made or caused to be made a series of materially false or misleading statements about KVH's earnings. These material misstatements and omissions created in the market an unrealistically positive assessment of KVH and its prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. The KVH Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the illusion was revealed, and the market was able to accurately value the Company.

19



## ADDITIONAL SCIENTER ALLEGATIONS

44.    As alleged herein, the KVH Defendants acted with scienter in that the KVH Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the KVH Defendants, by virtue of their receipt of information reflecting the true facts regarding KVH, their control over, and/or receipt and/or modification of KVH allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning KVH, participated in the fraudulent scheme alleged herein.

45.    Additionally before disclosure of the material adverse facts alleged herein, Company sold 2.75 million of its stock to the public for proceeds in excess of $51.5 million. Had the truth been known, the Company would not have been able to sell the shares at the price that it did.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

46.    At all relevant times, the market for KVH's securities was an efficient market for the following reasons, among others:

(a)    KVH's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, KVH filed periodic public reports with the SEC;

(c)    KVH regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of

20



press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    KVH was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.    As a result of the foregoing, the market for KVH's securities promptly digested current information regarding KVH from all publicly available sources and reflected such information in KVH's stock price. Under these circumstances, all purchasers of KVH's securities during the Class Period suffered similar injury through their purchase of KVH's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

48.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the KVH Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of KVH who knew that those statements were false when made.

21



## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of KVH's securities; and (c) cause plaintiff and other members of the Class to purchase KVH's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

51.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for KVH's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated

22

disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §§ 210.01 *et seq.*) and Regulation S-K (17 C.F.R. §§ 229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

53.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of KVH as specified herein.

54.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of KVH's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about KVH and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of KVH's securities during the Class Period.

55.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets,

plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

56.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing KVH's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of KVH's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of KVH's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired KVH securities during the Class Period at artificially high prices and were damaged thereby.

24

58.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of KVH, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their KVH securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     The Individual Defendants acted as a controlling person of KVH within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of

25

the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.    As set forth above, KVH and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of KVH's and the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as lead plaintiff and certifying plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as lead counsel;

26



B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

DATED:        July 27, 2004                    Respectfully submitted,

                                               **BARRY J. KUSINITZ (No. 1404)**

                                               By
                                               Barry Kusinitz
                                               155 South Main Street, Suite 405
                                               Providence, RI 02903
                                               Telephone: 401-831-4200
                                               Fax: 401-831-7053

                                               **MILBERG WEISS BERSHAD &**
                                               **SCHULMAN LLP**
                                               Steven G. Schulman
                                               Peter E. Seidman
                                               One Pennsylvania Plaza
                                               New York, NY 10119-0165
                                               Telephone: (212) 594-5300
                                               Fax:        (212) 868-1229


                                               **Attorneys for Plaintiff**

27

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, HOWARD VOGEL, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed KVH Industries, Inc. (NASDAQ: KVHI) complaint prepared by Milberg Weiss Bershad & Schulman LLP whom I designate as my counsel in this action for all purposes.

2.    I did not acquire KVH Industries, Inc. stock at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except CIT Group Securities Litigation

6.    I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

7.    I have made the following transactions in KVH Industries, Inc. and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 1000 | Buy | 2/10/04 | 18.75 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Please use and attach additional pages if necessary.

**I declare under penalty of perjury that the foregoing is true and correct**

Executed this 26 day of July, 2004

HOWARD VOGEL
Print Name

Signature