GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
DOUGLAS A. AXEL (Cal. Bar #173814)
Deputy Chief, Major Frauds Section
RICHARD E. ROBINSON (Cal. Bar #090840)
ROBERT J. MCGAHAN (Cal. Bar #196568)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0713
    Facsimile:  (213) 894-6269
    E-mail: Richard.Robinson@usdoj.gov
          Doug.Axel@usdoj.gov
          Robert.McGahan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 05-587(B)-JFW |
| | ) | |
| Plaintiff, | ) | **PLEA AGREEMENT FOR DEFENDANT DAVID J. BERSHAD** |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID J. BERSHAD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

    1.    This constitutes the plea agreement between DAVID J. BERSHAD ("defendant"), on the one hand, and the United States Attorney's Office for the Central District of California, on the other hand (the "USAO").  Except as provided in paragraph 20(d) below, this agreement is limited to the USAO and cannot bind any other federal, state, or local prosecuting, administrative or regulatory authorities.

/ / /

PLEA

2.   Defendant gives up the right to indictment by a grand jury and agrees to plead guilty to a one-count information in the form attached to this agreement or a substantially similar form.

NATURE OF THE OFFENSE

3.   In order for defendant to be guilty of count one of the information, which charges a violation of Title 18, United States Code, Section 371, the following must be true:

(a)   Beginning in or before 1981, and continuing through at least in or about 2005, there was an agreement between two or more persons to commit at least one of the crimes charged in the information, namely:

(i) to obstruct justice by corruptly influencing, obstructing, and impeding, and endeavoring to influence, obstruct, and impede, the due administration of justice in lawsuits filed and litigated in courts of the United States, in violation of Title 18, United States Code, Section 1503; and

(ii) to make false material declarations under oath in proceedings before and ancillary to courts of the United States, in violation of Title 18, United States Code, Section 1623(a);

(b)   defendant became a member of the conspiracy, that is, he joined in the illegal agreement, knowing of at least one of its objects and intending to help accomplish it; and

(c)   one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

/ / /

1    4.    Defendant admits that defendant is, in fact, guilty of
2    this offense, as described in count one of the information.

3                                PENALTIES

4    5.    The statutory maximum sentence that the Court can
5    impose for a violation of Title 18, United States Code,
6    Section 371, is five-years imprisonment; a three-year period of
7    supervised release; a fine of $250,000 or twice the gross gain or
8    gross loss resulting from the offense, whichever is greatest; and
9    a mandatory special assessment of $100.

10    6.    Supervised release is a period of time following
11    imprisonment during which defendant will be subject to various
12    restrictions and requirements.  Defendant understands that if
13    defendant violates one or more of the conditions of any
14    supervised release imposed, defendant may be returned to prison
15    for all or part of the term of supervised release, which could
16    result in defendant serving a total term of imprisonment greater
17    than the statutory maximum stated above.

18    7.    Defendant also understands that, by pleading guilty,
19    defendant may be giving up valuable government benefits and
20    valuable civic rights, such as the right to vote, the right to
21    possess a firearm, the right to hold office, and the right to
22    serve on a jury.

23    8.    Defendant further understands that the conviction in
24    this case may subject defendant to various collateral
25    consequences, including revocation or suspension of his license
26    to practice law.  Defendant understands that unanticipated
27    collateral consequences will not serve as grounds to withdraw
28    defendant's plea of guilty.

1    9.    The parties agree and stipulate that restitution is not
2  warranted.

3                       FACTUAL BASIS

4    10.    Defendant and the USAO agree and stipulate to the
5  statement of facts set forth in Exhibit A hereto.  This statement
6  of facts includes facts sufficient to support a plea of guilty to
7  the charge described in this agreement, and to establish the
8  sentencing guideline factors set forth in paragraph 14.  It is
9  not meant to be a complete recitation of all facts relevant to
10  the underlying criminal conduct or all facts known to either
11  party that relate to that conduct.

12         WAIVER OF CONSTITUTIONAL AND OTHER RIGHTS

13    11.  By pleading guilty, defendant gives up the following
14  rights:

15            (a)    The right to persist in a plea of not guilty.

16            (b)    The right to a speedy and public trial by jury.

17            (c)    The right to the assistance of legal counsel at
18  trial, including the right to have the Court appoint counsel for
19  defendant for the purpose of representation at trial.  (In this
20  regard, defendant understands that, despite his plea of guilty,
21  he retains the right to be represented by counsel -- and, if
22  necessary, to have the Court appoint counsel if defendant cannot
23  afford counsel -- at every other stage of the proceeding.)

24            (d)    The right to be presumed innocent and to have the
25  burden of proof placed on the government to prove defendant
26  guilty beyond a reasonable doubt.

27            (e)    The right to confront and cross-examine witnesses
28  against defendant.

1    (f)   The right, if defendant wished, to testify on

2  defendant's own behalf and present evidence in opposition to the

3  charges, including the right to call witnesses and to subpoena

4  those witnesses to testify.

5    (g)   The right not to be compelled to testify, and, if

6  defendant chose not to testify or present evidence, to have that

7  choice not be used against defendant.

8    12.   By pleading guilty, defendant gives up any and all

9  rights to pursue any affirmative defenses, Fourth Amendment or

10  Fifth Amendment claims, and other pretrial motions that could be

11  filed on his behalf, including assertion of any defense based on

12  statute of limitations or venue.

13                         SENTENCING FACTORS

14    13.   Defendant understands that the Court is required to

15  consider the factors set forth in 18 U.S.C. § 3553(a)(1)-(7),

16  including the kinds of sentence and sentencing range established

17  under the United States Sentencing Guidelines ("U.S.S.G." or

18  "Sentencing Guidelines") in determining defendant's sentence.

19  Defendant further understands that the Sentencing Guidelines are

20  advisory only, and that after considering the Sentencing

21  Guidelines and the other § 3553(a) factors, the Court may be free

22  to exercise its discretion to impose any reasonable sentence up

23  to the maximum set by statute for the crime of conviction.

24    14.   Defendant and the USAO agree and stipulate to the

25  following applicable Sentencing Guidelines factors:

26  Base Offense Level:          14   [U.S.S.G. § 2J1.2(a)]

27

28

5

```
Specific Offense
Characteristics

   Substantial interference
   with admin. of justice:      +3    [U.S.S.G. § 2J1.2(b)(2)]

   Obstruction extensive in
   scope                        +2    [U.S.S.G. § 2J1.2(b)(3)]


   Abuse of position of trust:  +2    [U.S.S.G. § 3B1.3]

Acceptance of
responsibility:                 -3    [U.S.S.G. § 3E1.1]
```
_____

Total offense level:        <u>18</u>

The USAO will agree to a downward adjustment for acceptance of

responsibility only if the conditions set forth in paragraph

20(c) are met.  Subject to paragraphs 16 and 20(i), defendant and

the USAO agree not to seek, argue, or suggest in any way, either

orally or in writing, that any other specific offense

characteristics, adjustments or departures, relating to either

the applicable Offense Level or the Criminal History Category, be

imposed.  If, however, after signing this agreement but prior to

sentencing, defendant were to commit an act, or the USAO were to

discover a previously undiscovered act committed by defendant

prior to signing this agreement, which act, in the judgment of

the USAO, constituted obstruction of justice within the meaning

of U.S.S.G. § 3C1.1, the USAO would be free to seek the

enhancement set forth in that section.  Defendant and the USAO,

pursuant to the factors set forth in 18 U.S.C. § 3553(a)(1),

(a)(2), (a)(3), (a)(6), and (a)(7), further reserve the right to

argue for a sentence outside the sentencing range established by

the Sentencing Guidelines, except that the USAO agrees not to

argue for a sentence above the low end of the applicable

guideline range.

15.    There is no agreement as to defendant's criminal history or criminal history category.

16.    The stipulations in this agreement do not bind either the United States Probation Office or the Court.  Both defendant and the USAO are free to:

(a)    Supplement the facts by supplying relevant information to the United States Probation Office and the Court;

(b)    Correct any and all factual misstatements relating to the calculation of the sentence; and

(c)    Argue on appeal and collateral review that the Court's Sentencing Guidelines calculations are not error, although each party agrees to maintain its view that the stipulated calculations in paragraph 14 are correct given the facts of this case.

<u>DEFENDANT'S OBLIGATIONS</u>

17.    Defendant agrees that he will:

(a)    Plead guilty as set forth in this agreement.

(b)    Not knowingly and willfully fail to abide by all sentencing stipulations contained in this agreement.

(c)    Not knowingly and willfully fail to: (i) appear for all court appearances, (ii) surrender as ordered for service of sentence, (iii) obey all conditions of any bond, and (iv) obey any other ongoing court order in this matter.

(d)    Not commit any crime; however, offenses which would be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are not within the scope of this agreement.

(e)    Not knowingly and willfully fail to be truthful at

all times with Pretrial Services, the United States Probation
Office, and the Court.

(f)    Pay the applicable special assessment at or before
the time of sentencing.

(g)    At the time of sentencing, pay the fine imposed by
the Court, up to a maximum of $250,000.  In this regard,
defendant agrees that consideration of the factors set forth in
18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C), and (a)(3), justifies a
fine amount of $250,000.

18.    Defendant further agrees to cooperate fully with the
USAO, the Internal Revenue Service, the Postal Inspection Service
and, as directed by the USAO, with any other federal law
enforcement agency.  As used in this agreement, "cooperation"
requires defendant to:

(a)    Respond truthfully and completely to all questions
that may be put to defendant, whether in interviews, before a
grand jury, or at any trial or other court proceeding.

(b)    Attend all interviews, meetings, grand jury
sessions, trials or other proceedings at which defendant's
presence is requested by the USAO or compelled by subpoena or
court order.

(c)    Produce voluntarily all documents, records, or
other tangible evidence relating to matters about which the USAO,
or its designee, inquires.

(d)    Authorize the disclosure and release by any third
parties of any and all documents, records, or other tangible
evidence relating to his cooperation.

19.    Defendant further agrees to forfeit to the United

1    States the amount of $7,750,000 (the "Forfeitable Currency"),

2    which defendant agrees shall be forfeited through administrative,

3    judicial criminal or judicial civil forfeiture (at the sole

4    election of the United States), pursuant to 28 U.S.C. § 2461(c),

5    18 U.S.C. § 981(a)(1)(C) and/or 18 U.S.C. § 981(a)(1)(A).

6    Defendant further agrees:

7         (a)  That the Forfeitable Currency constitutes or is

8    derived from net proceeds of the conspiracy to obstruct justice

9    (18 U.S.C. § 1503) and to make material false statement under

10    oath (18 U.S.C. § 1623) in violation of 18 U.S.C. § 371 described

11    in count one of the information;

12         (b)  That said conspiracy resulted in net proceeds in

13    excess of $7,750,000;

14         (c)  That at the sole and absolute discretion of the

15    USAO, the USAO may elect to cause to be entered (i) a money

16    judgment of forfeiture in the amount of the Forfeitable Currency

17    and apply the Forfeitable Currency toward satisfaction of the

18    judgment and/or (ii) a preliminary and final orders of forfeiture

19    of the Forfeitable Currency at or before sentencing;

20         (d)  That within 30 days from the date of defendant's

21    signature herein defendant shall pay the Forfeitable Currency to

22    the United States by electronic funds transfer.  Said transfer of

23    the funds shall be made to the Federal Reserve Bank of New York,

24    33 Liberty Street, New York, New York 10045, pursuant to

25    instructions to be provided by the USAO.  The government will

26    hold the funds in the Seized Asset Deposit Funds Account until

27    the funds are applied to satisfy any money judgment and/or are

28    forfeited pursuant to any final order of forfeiture described in

1  paragraph 19(c) above;

2          (e)  That defendant has clear and sole title to the
3  Forfeitable Currency he promises to deliver to the USAO;

4          (f)  Not to contest the forfeiture of the Forfeitable
5  Currency in any administrative or judicial proceeding;

6          (g)  To abandon, relinquish, and waive, and by
7  executing this agreement defendant hereby does abandon,
8  relinquish and waive any and all rights in the Forfeitable
9  Currency in favor of the United States;

10          (h)  To waive all constitutional and statutory
11 challenges to forfeiture of the Forfeitable Currency on any
12 grounds, including any statutes of limitations and the Excessive
13 Fines Clause;

14          (i)  To take all steps as requested by the USAO that
15 are reasonable to pass to the United States clear title to the
16 Forfeitable Currency, including, without limitation, the
17 execution of a consent decree of forfeiture, the completing of
18 any other legal documents required for the transfer of title to
19 the United States, and causing defendant's spouse to execute a
20 consent to decree of forfeiture, all such documents to be
21 delivered to the United States along with the electronic transfer
22 of funds as described in paragraph 19(d) above;

23          (j)  Not to assist any other person in any effort
24 falsely to contest the forfeiture of the Forfeitable Currency;

25          (k)  That forfeiture of the Forfeitable Currency shall
26 not be counted toward satisfaction of any special assessment,
27 fine, restitution, or any other penalty the Court may impose, nor
28 shall it be counted toward satisfaction of any taxes, penalties,

1  or interest owed to the Internal Revenue Service or any other
2  taxing authority; and

3      (l)  With respect to any forfeiture of the Forfeitable
4  Currency, to waive and relinquish and hereby waive and relinquish
5  the requirements of: (i) Federal Rules of Criminal Procedure 32.2
6  and 43(a) regarding notice of the forfeiture in the charging
7  instrument, announcement of the forfeiture at the sentencing, and
8  incorporation of the forfeiture in the judgment; and (ii) 21
9  U.S.C. § 853(p)(1) regarding due diligence, transfer to third
10  party, placement beyond the jurisdiction of the court,
11  substantial diminution of value and commingling.

12                    THE USAO'S OBLIGATIONS

13     20.  If defendant complies fully with all defendant's
14  obligations under this agreement, the USAO agrees:

15      (a)  To abide by all sentencing stipulations contained
16  in this agreement and to advocate to the Court that the only
17  applicable specific offense characteristics, adjustments, and
18  departures are those set forth in paragraph 14 above and
19  paragraph 20(i) below.

20      (b)  At the time of sentencing to move to dismiss the
21  underlying indictment against defendant only.

22      (c)  At the time of sentencing, provided that defendant
23  demonstrates an acceptance of responsibility for the offense with
24  which he is charged in the information up to and including the
25  time of sentencing, to recommend a three-level reduction in the
26  applicable Sentencing Guidelines offense level, pursuant to
27  U.S.S.G. § 3E1.1.

28      (d)  Not to further prosecute defendant for violations

of federal law arising out of: (i) the conduct charged in the
first superseding indictment in this case and/or described in
Exhibit A hereto; (ii) payments to or for the benefit of
stockbrokers and/or non-lawyers for serving as plaintiffs and/or
for referring other persons and/or entities to serve as
plaintiffs; (iii) requests to courts for reimbursement of fees
and costs of a damages expert witness and/or his associated
entities based in Princeton, New Jersey (collectively the
"Princeton Expert"); (iv) the Princeton Expert's financial
relationship with PNC Bank; and (v) election, campaign, or other
political contributions.  The non-prosecution provisions of this
paragraph are binding on the USAO, the United States Attorney's
Offices for each of the other 93 judicial districts of the United
States ("the other USAOs"), and the United States Department of
Justice ("DOJ").  Defendant understands and agrees that the USAO,
the other USAOs, and DOJ are free to prosecute defendant for any
other unlawful past conduct not specifically exempted by this
agreement or any illegal conduct that occurs after the date of
this agreement.

        (e)   Not to offer as evidence in its case-in-chief in
the above-captioned case or in any other prosecution that may be
brought against defendant by the USAO, the other USAOs, or DOJ
any statements made by defendant or documents, records, or
tangible evidence provided by defendant pursuant to defendant's
cooperation provided pursuant to this agreement and pursuant to
the proffer letter agreement between defendant and the USAO
signed by defendant on June 1, 2007 (the "Letter Agreement").
Defendant, however, agrees that the USAO, the other USAOs, and

1   DOJ may use such statements, documents, records, and tangible
2   evidence: (1) to obtain and pursue leads to other evidence, which
3   evidence may be used for any purpose, including prosecution of
4   defendant; (2) to cross-examine defendant should defendant
5   testify, or to rebut any evidence, argument or representations
6   made by defendant or a witness called by defendant in any trial,
7   sentencing hearing, or other court proceeding; and (3) in any
8   prosecution of defendant for false statement, obstruction of
9   justice, or perjury.

10          (f)   Not to use any information provided by defendant
11  pursuant to this agreement or the Letter Agreement against
12  defendant at sentencing for the purpose of determining the
13  applicable Sentencing Guideline range, including the
14  appropriateness of an upward departure, and to recommend to the
15  Court that such information not be used in determining the
16  sentence to be imposed.  Defendant understands, however, that
17  information provided by defendant pursuant to this agreement or
18  the Letter Agreement will be disclosed to the Probation Office
19  and the Court, and that the Court may use this information for
20  the purposes set forth in U.S.S.G § 1B1.8(b) and for determining
21  the sentence to be imposed.

22          (g)   Not to pursue any additional civil or criminal
23  forfeiture claims against defendant.

24          (h)   If requested by the defendant or his counsel, to
25  bring to the Court's attention the nature and extent of
26  defendant's cooperation, in connection with his sentencing.

27          (i)   If the USAO determines, in its exclusive judgment,
28  that defendant has both complied with his obligations under

13

1  paragraphs 17, 18, and 19 above and provided substantial
2  assistance to law enforcement in the prosecution or investigation
3  of another ("substantial assistance"), to move the Court pursuant
4  to U.S.S.G. § 5K1.1 to fix an offense level and corresponding
5  guideline range below that otherwise advised by the Sentencing
6  Guidelines, and to recommend a sentence no greater than the low-
7  end of this reduced range.

8          (j)   To recommend to the Court that a fine of $250,000
9  is reasonable and that no other fine amount should be imposed.
10         DEFENDANT'S UNDERSTANDINGS REGARDING SUBSTANTIAL ASSISTANCE
11         21.  Defendant understands the following:

12         (a)   Any knowingly false or misleading statement by
13  defendant will subject defendant to prosecution for false
14  statement, obstruction of justice, and perjury and will
15  constitute a breach by defendant of this agreement.

16         (b)   Nothing in this agreement requires the USAO or any
17  other prosecuting or law enforcement agency to accept any
18  cooperation or assistance that defendant may offer, or to use it
19  in any particular way.

20         (c)   Defendant cannot withdraw defendant's guilty plea
21  if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1
22  for a reduced sentence or if the USAO make such a motion and the
23  Court does not grant it or if the Court grants such a motion by
24  the USAO but elects to sentence above the reduced range.

25         (d)   At this time the USAO makes no agreement or
26  representation as to whether any cooperation that defendant has
27  provided or intends to provide constitutes substantial
28  assistance.  The decision whether defendant has provided

14

1  substantial assistance rests solely within the discretion of the
2  USAO.

3        (e)   The USAO's determination of whether defendant has
4  provided substantial assistance will not depend in any way on
5  whether the government prevails at any trial or court hearing in
6  which defendant testifies.

7                         BREACH OF AGREEMENT

8        22.   If defendant, at any time after the execution of this
9  agreement knowingly and willfully violates or fails to perform
10 any of defendant's obligations under this agreement ("a breach"),
11 the USAO may declare this agreement breached.  For example, if
12 defendant fails to enter a guilty plea pursuant to paragraph
13 17(a) of this agreement, fails to cooperate pursuant to paragraph
14 18 of this agreement, or knowingly and willfully in an interview,
15 before a grand jury, or at trial, falsely accuses another person
16 or entity of criminal conduct or falsely minimizes his own role,
17 or the role of another, in criminal conduct, or fails to pay the
18 Forfeitable Currency pursuant to paragraph 19 of this agreement,
19 he will have breached this agreement.  If the USAO declares the
20 agreement breached at any time between the execution of this
21 agreement and defendant's sentencing on a non-custodial sentence
22 or surrender for service of a custodial sentence, and the Court
23 finds such a breach to have occurred, defendant will not be able
24 to withdraw defendant's guilty plea (if, at the time of the
25 breach, he had previously entered his guilty plea), and the USAO
26 will be relieved of all its obligations under this agreement.  If
27 the USAO declares this agreement breached at any time after
28 defendant's sentencing on a non-custodial sentence or surrender

1  for service on a custodial sentence, and the Court finds such a
2  breach to have occurred, the USAO will be relieved of all its
3  then-remaining obligations under this agreement.  In addition, if
4  the USAO declares the agreement breached, and the Court finds
5  such a breach to have occurred, the other USAOs and DOJ will no
6  longer be bound by the non-prosecution provisions of paragraph
7  20(d) above.

8       23.  Following a knowing and willful breach of this
9  agreement by defendant, should the USAO, the other USAOs, or DOJ
10  elect to pursue any charge that was dismissed or that it would
11  have been obligated to dismiss or that was not filed as a result
12  of this agreement, then:

13           (a)  Defendant agrees that any applicable statute of
14  limitations is tolled between the date of defendant's signing of
15  this agreement and the commencement of any such prosecution or
16  action.

17           (b)  Defendant gives up all defenses based on the
18  statute of limitations, any claim of pre-indictment delay, or any
19  speedy trial claim with respect to any such prosecution, except
20  to the extent that such defenses existed as of the date of
21  defendant's signing this agreement.

22           (c)  Defendant agrees that: (i) any statements made by
23  defendant, under oath, at the guilty plea hearing (if there was
24  such a hearing); (ii) the stipulated factual basis statement in
25  this agreement; and (iii) any evidence derived from such
26  statements, are admissible against defendant in any prosecution
27  of defendant by the USAO, the other USAOs, or DOJ, and defendant
28  shall assert no claim under the United States Constitution, any

16

1  statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of
2  the Federal Rules of Criminal Procedure, or any other federal
3  rule, that the statements or evidence derived from any statements
4  should be suppressed or are inadmissible.

5          LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

6      24.  Defendant gives up the right to appeal any sentence
7  imposed by the Court and the manner in which the sentence is
8  determined, provided that (a) the sentence is within the
9  statutory maximum specified above and is constitutional, (b) the
10 Court in determining the applicable guideline range does not
11 depart upward in offense level or criminal history category and
12 determines that the total offense level is 18 or below, and
13 (c) the Court imposes a sentence within or below the range
14 corresponding to the determined total offense level and criminal
15 history category.  Defendant also gives up any right to bring a
16 post-conviction collateral attack on the conviction or sentence,
17 except a post-conviction collateral attack based on a claim of
18 ineffective assistance of counsel, a claim of newly discovered
19 evidence, or an explicitly retroactive change in the applicable
20 Sentencing Guidelines, sentencing statutes, or statutes of
21 conviction.  Notwithstanding the foregoing, defendant retains any
22 ability defendant has to appeal the amount or terms of any fine,
23 restitution order, and the conditions of supervised release
24 imposed by the Court, with the exception of the following:
25 conditions set forth in General Orders 318 and 01-05 of this
26 Court; and the drug testing conditions mandated by 18 U.S.C. §§
27 3563(a)(5) and 3583(b)(7); and the alcohol and drug use
28 conditions authorized by 18 U.S.C. § 3563(b)(7).

1    25.   The USAO gives up its right to appeal the sentence,
2    provided that (a) the Court in determining the applicable
3    guideline range does not depart downward in offense level or
4    criminal history category (except by a downward departure in
5    offense level pursuant to, and to the extent requested by the
6    USAO in a motion under U.S.S.G. § 5K1.1), (b) the Court
7    determines that the total offense level is 18 or above prior to
8    any departure under U.S.S.G. § 5K1.1, and (c) the Court imposes a
9    sentence within or above the range corresponding to the
10   determined offense level (after any downward departure under
11   U.S.S.G. § 5K1.1) and criminal history category.

12                         COURT NOT A PARTY

13   26.   The Court is not a party to this agreement and need not
14   accept any of the USAO's sentencing recommendations or the
15   parties' stipulations.  Even if the Court ignores any sentencing
16   recommendation, finds facts or reaches conclusions different from
17   any stipulation, and/or imposes any sentence up to the maximum
18   established by statute, defendant cannot, for that reason,
19   withdraw defendant's guilty plea, and defendant will remain bound
20   to fulfill all defendant's obligations under this agreement.  No
21   one -- not the prosecutor, defendant's attorney, or the Court --
22   can make a binding prediction or promise regarding the sentence
23   defendant will receive, except that it will be within the
24   statutory maximum.

25   27.   This agreement applies only to crimes committed by
26   defendant and has no effect on any proceedings against defendant
27   not expressly mentioned herein.

28

                               18

## SCOPE OF AGREEMENT

28.   Except as specified in paragraph 20(d) above, which makes the non-prosecution provisions of this agreement binding on the USAO, the other USAOs, and DOJ, this agreement is binding only on defendant and the USAO, does not bind any federal, state, or local agency or prosecuting authority, or any federal, state, or local administrative or regulatory authority.

## NO ADDITIONAL AGREEMENTS

29.   Except as set forth herein, there are no promises, understandings or agreements between the USAO and defendant or defendant's counsel.  This agreement supersedes and replaces the Letter Agreement.  Nor may any additional agreement, understanding or condition be entered into unless in a writing signed by all parties or on the record in court.

## PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

30.   The parties agree and stipulate that this agreement will be considered part of the record of defendant's guilty plea hearing as if this entire agreement had been read into the record of such proceedings.

31.   This agreement is effective upon signature by

///

///

///

///

1  defendant, defendant's attorney, and the United States Attorney.

2  AGREED AND ACCEPTED

3  UNITED STATES DEPARTMENT OF JUSTICE:

4

5  _____          7/9/2007
   GEORGE S. CARDONA                     Date
6  United States Attorney

7  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA:
8

9  _____          7/9/2007
10 GEORGE S. CARDONA                     Date
   United States Attorney
11

12 _____          7/9/07
13 DOUGLAS A. AXEL                       Date
   Assistant United States Attorney
14 Deputy Chief, Major Frauds Section

15

16 _____          7/9/07
   RICHARD E. ROBINSON                   Date
17 Assistant United States Attorney
   Major Frauds Section
18

19 _____          7/9/07
20 ROBERT J. MCGAHAN                     Date
   Assistant United States Attorney
21 Major Frauds Section

22

23      I, DAVID J. BERSHAD, have read this agreement and carefully

24 discussed every part of it with my attorney.  I understand the

25 terms of this agreement, and I voluntarily agree to those terms.

26 My attorney has advised me of my rights, of possible defenses, of

27 the Sentencing Guideline provisions, and of the consequences of

28 ///

1    entering into this agreement.   No promises or inducements have

2    been made to me other than those contained in this agreement.   No

3    one has threatened or forced me in any way to enter into this

4    agreement.   Finally, I am satisfied with the representation of my

5    attorney in this matter.

6

7    _____        _____
     DAVID J. BERSHAD                      Date
8    Defendant

9        I am DAVID J. BERSHAD's attorney.   I have carefully

10   discussed every part of this agreement with my client.   Further,

11   I have fully advised my client of his rights, of possible

12   defenses, of the sentencing factors set forth in 18 U.S.C.

13   § 3553(c), including the relevant Sentencing Guidelines

14   provisions, and of the consequences of entering into this

15   agreement.   To my knowledge, my client's decision to enter into

16   this agreement is an informed and voluntary one.

17

18   By: _____     _____
     CRISTINA C. ARGUEDAS, ESQ.            Date
     ARGUEDAS CASSMAN & HEADLEY LLP
19

     Counsel for Defendant
20   DAVID J. BERSHAD

21

22

23

24

25

26

27

28                                   2

**EXHIBIT A**

**STATEMENT OF FACTS IN SUPPORT OF DAVID J. BERSHAD PLEA AGREEMENT AND INFORMATION**

Defendant DAVID J. BERSHAD ("BERSHAD") represents and admits that the following facts are true. Pseudonyms, capitalized terms, and case names herein have the same meanings as are ascribed to them in the first superseding indictment in United States v. Milberg Weiss Bershad & Schulman LLP, et al., CR 05-587(A)-JFW (the "FSI").

<u>Introduction</u>

1.   At all relevant times, BERSHAD was a name partner in Milberg Weiss & Bershad LLP, formerly known as "Milberg Weiss Bershad & Schulman LLP," "Milberg Weiss Bershad Hynes & Lerach LLP," and "Milberg Weiss Bershad Specthrie & Lerach" (hereinafter "Milberg Weiss"). BERSHAD worked in Milberg Weiss's principal office in New York, New York, was one of the managing partners of Milberg Weiss, and was the senior partner primarily responsible for overseeing Milberg Weiss's financial affairs and accounting department.

2.   Milberg Weiss specialized in serving as plaintiff's counsel in class actions and shareholder derivative actions (collectively "Class Actions") brought in federal and state courts throughout the United States, including in the Central District of California.

3.   As counsel seeking to represent and representing class

-1-

members or shareholders not before the courts (collectively "absent class members"), Milberg Weiss and its attorneys, including BERSHAD, had fiduciary duties of loyalty, honesty, and trust to absent class members. Individuals who sought to be authorized by the courts to serve and who served as representative plaintiffs on behalf of absent class members (hereinafter "named plaintiffs") likewise had fiduciary duties of loyalty, honesty, and trust to those absent class members.

<u>Overview of Secret Payment Arrangements</u>

4. Beginning in or about the 1970s and continuing through 2005, in order to facilitate the recruitment and retention of named plaintiffs, certain senior Milberg Weiss partners agreed with various individuals that Milberg Weiss would secretly pay those individuals a portion of the attorneys' fees that Milberg Weiss obtained in Class Actions in which such individuals served, or caused a relative or associate to serve, as a named plaintiff.

5. The Milberg Weiss partners who agreed during the relevant times to secretly pay the named plaintiffs included BERSHAD, Partner A, Partner B, Steven G. Schulman ("Schulman"), Partner E, and two other senior Milberg Weiss partners, referred to herein as "Partner F" and "Partner G" (collectively the "Conspiring Partners").

6. The individuals who agreed to serve as named plaintiffs in Class Actions pursuant to the secret payment arrangement with Milberg Weiss included, among others, Seymour M. Lazar ("Lazar"),

Howard J. Vogel ("Vogel"), and Steven G. Cooperman ("Cooperman"), as well as three named plaintiffs who resided, at times, in Florida (hereinafter the "Florida paid plaintiffs"). Generally, these individuals were promised that they would be paid approximately 10% of the net attorneys' fees that Milberg Weiss obtained in their respective Class Actions, although they were also told by BERSHAD and other Conspiring Partners that the amount would be lower if they were paid in cash or if Milberg Weiss had payment obligations on the same case to others.

7.    By entering into such secret payment arrangements, BERSHAD and the other Conspiring Partners were able to secure a reliable source of individuals who were ready, willing, and able to serve as named plaintiffs in Class Actions that Milberg Weiss wanted to bring. In addition, some of these individuals would investigate and propose to BERSHAD and other Conspiring Partners potential Class Actions for Milberg Weiss to bring. Such payment arrangements generally enabled Milberg Weiss to file more Class Actions and to file them more quickly than would be possible absent such arrangements. Filing Class Actions more quickly than other competing plaintiffs' law firms enhanced Milberg Weiss's ability to obtain lead counsel status in cases, before and after the passage of the Private Securities Litigation Reform Act of 1995. Lead counsel generally obtained a larger share of the attorneys' fees awarded in a Class Action than other counsel. The secret payments arrangements with paid plaintiffs played a

-3-

meaningful role in enabling Milberg Weiss to grow.

8.   At all relevant times, BERSHAD, the other Conspiring Partners, and the paid plaintiffs knew that their secret payment arrangements were improper.

9.   BERSHAD knew that it was improper for Milberg Weiss to secretly share attorneys' fees with the paid plaintiffs, and that such payment arrangements created conflicts of interest between the paid plaintiffs and the absent class members they purported to represent.  BERSHAD believed that discovery in a Class Action of the secret payment arrangement with a named plaintiff could have resulted in, among other things: (a) the disqualification of the named plaintiff from serving as a class representative in that action and other Class Actions; (b) the disqualification of Milberg Weiss, including the Conspiring Partners, from serving as class counsel in that action and other Class Actions; and (c) referral to a disciplinary committee and a risk of revocation or suspension of one or more of the Conspiring Partners' licenses to practice law.

10.   At all relevant times, BERSHAD, the other Conspiring Partners, and the paid plaintiffs knew that their payment arrangements had to be concealed from the federal and state courts presiding over their Class Actions.  BERSHAD, the other Conspiring Partners, and the paid plaintiffs also understood that, to the extent necessary, they would make or cause to be made false and/or misleading statements in documents filed in

-4-

federal and state Class Actions (including complaints, motions, and under-oath certifications) and in under-oath testimony and other discovery in such actions in order to conceal the existence of their secret payment arrangements.

11.  When BERSHAD prepared individuals for their Class Action depositions whom he knew had payment arrangements with Milberg Weiss, BERSHAD's practice was to caution them that they would be disqualified from serving as named plaintiffs if it were disclosed that they had received or been promised a share of Milberg Weiss's attorneys' fees.  BERSHAD provided this caution with the expectation that these individuals would then conceal in their depositions and elsewhere, as necessary, the existence of their payment arrangements with Milberg Weiss.  BERSHAD never advised Lazar or any other paid plaintiffs that the payments made to them or to intermediaries for their benefit was in compliance with applicable law.

12.  To further conceal the payments made to various named plaintiffs, BERSHAD, Partner A, Partner B, and Partner E delivered some of them in cash.  Regarding the cash used to pay these paid plaintiffs:

(a)  In the earlier years of the conspiracy, BERSHAD, Partner A, Partner B, Partner F, and Partner G pooled their personal cash into a fund BERSHAD maintained in his office at Milberg Weiss, which was used by the Conspiring Partners to supply cash for secret payments to paid plaintiffs and others.

-5-

The amounts the Conspiring Partners each contributed were supposed to be approximately proportionate to their respective partnership interests in Milberg Weiss.  BERSHAD kept track of the amounts contributed and of the secret cash payments that had been made to paid plaintiffs.

(b)  Later in the conspiracy, BERSHAD, Partner A, Partner B, Partner F, and Partner G caused Milberg Weiss to award "bonuses" to them, amounting to the cash they had contributed, plus additional amounts intended to approximate the income taxes payable by them on such "bonuses."  To implement this practice, BERSHAD, Partner A, Partner B, Partner F, and Partner G caused to be included in Milberg Weiss's first written partnership agreement, adopted in 1986, a provision that enabled them to allocate up to 10% in the aggregate of the partnership's net income to one or more partners prior to determining the equity partners' shares of the firm's net income.  A comparable bonus provision was maintained in Milberg Weiss's partnership agreements thereafter.  A purpose of these bonus provisions was to enable BERSHAD, Partner A, Partner B, Partner F, and Partner G, who determined in their sole discretion the allocation of the bonuses, to use Milberg Weiss profits to compensate themselves for the cash they had contributed to the secret payment fund.

(c)  Schulman did not contribute cash to the fund for paying plaintiffs because he claimed he lacked the money to do so.  With the express approval of BERSHAD and Partner A, Partner

-6-

E contributed some cash to the fund on one occasion, and was later compensated by BERSHAD, Partner A and Partner B via a Milberg Weiss bonus award.

(e)  BERSHAD personally provided cash payments to two of the Florida paid plaintiffs, and was told by Partner A that Partner A had personally provided cash payments to at least one of the Florida paid plaintiffs.  Partner B also told BERSHAD that he should be credited for cash that Partner B had used to pay a plaintiff.

(f)  BERSHAD provided cash to Partner E to deliver a cash payment to Vogel.

13.  BERSHAD and the other Conspiring Partners also concealed the payments to named plaintiffs in other ways.  Among them was to have paid plaintiffs select intermediary law firms, lawyers, and other professionals through whom they would be paid. BERSHAD and other Conspiring Partners would cause Milberg Weiss checks to be issued to these intermediaries, with the understanding and intent that the money would be distributed to or used for the benefit of the paid plaintiffs.  BERSHAD and other Conspiring Partners knew that although these payments were variously documented and described as, among other things, "referral fees" and "professional fees" owed by Milberg Weiss to the intermediaries, they were actually for the benefit of the paid plaintiffs.  BERSHAD caused false and misleading information to be provided to Milberg Weiss's outside accountants and tax

-7-

return preparers, as well as the Internal Revenue Service, concerning such payments, to describe them as legitimate fees paid for the benefit of the intermediary lawyers and other professionals, rather than as payments for the benefit of the paid plaintiffs.

### Secret Payment Arrangement With Seymour Lazar

14.  Partner A, on behalf of Milberg Weiss, established a secret payment arrangement with Lazar. Soon after Lazar first became a named plaintiff for Milberg Weiss, Partner A told BERSHAD that Milberg Weiss was to pay Lazar a percentage of the attorneys' fees that Milberg Weiss obtained in Lazar's cases, as described in paragraph 6 above. BERSHAD later discussed the Lazar payment arrangement with other of the Conspiring Partners.

15.  When the first payment to Lazar came due, Partner A told BERSHAD that Lazar was willing to have the payment obligation to him satisfied by Milberg Weiss making an investment in a business venture with which Lazar was affiliated. Partner A told BERSHAD that they should satisfy their obligation to Lazar by supporting this business venture and at the same time have an opportunity to make some money. As a result, Milberg Weiss issued a check to Lazar's associated business venture in 1979, to benefit Lazar for serving as a named plaintiff. Also at Lazar's request, another payment to benefit Lazar was made in 1984 via a Milberg Weiss check issued to Lazar's accountant in California.

16.  Partner A subsequently told BERSHAD that Partner A had

-8-

agreed with Lazar that Milberg Weiss would satisfy its payment obligations to Lazar by paying the intermediary law firms that Lazar designated.

17.  Lazar and certain of his relatives served as named plaintiffs for Milberg Weiss in numerous Class Actions.  To satisfy Milberg Weiss's payment obligation to Lazar on these cases, BERSHAD caused Milberg Weiss checks to be written to one of Lazar's sons (who was an attorney), the Palm Springs Law Firm, and other intermediary law firms and attorneys, as selected by Lazar.  BERSHAD caused these payments to be documented and falsely described as, among other things, "referral fees" and the "share of fees" owed by Milberg Weiss to these intermediaries. Nonetheless, BERSHAD understood that such payments represented monies that Milberg Weiss owed to Lazar, were made to satisfy Milberg Weiss's payment obligation to Lazar, and would be used for Lazar's benefit or at his direction.

### Secret Payment Arrangement With Steven Cooperman

18.  Partner B, on behalf of Milberg Weiss, established a secret payment arrangement with Steven Cooperman, pursuant to which Milberg Weiss would pay Cooperman a percentage of the attorneys' fees that Milberg Weiss obtained in Cooperman's cases, as described in paragraph 6 above.  BERSHAD discussed Cooperman's payment arrangement with other of the Conspiring Partners.

19.  Near the conclusion of Cooperman's Newhall Land class action, Partner B told BERSHAD that Cooperman wanted to be paid

-9-

right away and that the amount Milberg Weiss was going to pay
Cooperman on the case was about $175,000.  Partner B also told
BERSHAD that Cooperman was going to be a very important client
for Milberg Weiss going forward.

20.  Partner A, Partner B, and BERSHAD discussed the means
by which Milberg Weiss could quickly get Cooperman the money the
firm owed him on <u>Newhall Land</u>.  After some discussion, Partner A,
Partner B, and BERSHAD agreed that Partner A would travel to
California, meet with Cooperman, and pay him $175,000 from
Partner A's own funds.  Partner A would do this by either using a
strategy involving a phony option to buy art from Cooperman or
overpaying for art purchased from Cooperman.

21.  Partner A subsequently paid Cooperman $175,000 in 1989,
documented as a phony "refundable option" payment for Partner A's
right to purchase a painting owned by Cooperman.  Partner A
waited a period of time and then declined to exercise the phony
"option."   In truth, the "option" payment by Partner A was a
means to get Cooperman money quickly, to compensate him for
having served as a plaintiff in <u>Newhall Land</u>.  In the meantime,
Partner A, Partner B and BERSHAD discussed how to get funds to
Cooperman through other means, so that Cooperman could then
refund the phony "option" payment to Partner A.

22.  Eventually, Partner A, Partner B, and BERSHAD decided
that they would cause Milberg Weiss to pay Cooperman through his
brother-in-law ("Cooperman Brother-in-Law B"), who had a business

-10-

background.  They further decided that the Milberg Weiss payments
would be disguised as compensation to Cooperman Brother-in-Law B
for his services as a consultant on Class Action cases when, in
fact, the payments were primarily intended to compensate
Cooperman for serving as a named plaintiff in <u>Newhall Land</u>.

23.  BERSHAD then met with Schulman and with Partner E to
identify Class Actions that Milberg Weiss controlled and had a
good likelihood of success, for which they could pay Cooperman
Brother-in-Law B consulting fees.  BERSHAD explained to Schulman
and to Partner E that Milberg Weiss had an obligation to
Cooperman who was serving as a named plaintiff.  After Schulman
and Partner E identified suitable cases, BERSHAD caused Milberg
Weiss to issue several consulting "retainer" checks to Cooperman
Brother-in-Law B in 1989 and 1990 with regard to specific Milberg
Weiss cases.  BERSHAD discussed with Partner A and Partner B that
Milberg Weiss payments to Cooperman Brother-in-Law B would supply
funds to Cooperman so that Cooperman, in turn, would repay
Partner A the $175,000 he had provided Cooperman under the guise
of the phony "option."

24.  Cooperman, Cooperman Plaintiff 1, Cooperman Plaintiff
2, and certain of Cooperman's relatives and associates served as
named plaintiffs for Milberg Weiss in numerous other Class
Actions.  To satisfy Milberg Weiss's payment obligation to
Cooperman on these cases, BERSHAD caused Milberg Weiss checks to
be written to intermediary attorneys and their associated law

-11-

firms selected by Cooperman, namely Richard R. Purtich and James P. Tierney (referred to as Cooperman Intermediary A and Cooperman Intermediary B in the FSI). BERSHAD caused these payments to be documented and falsely described as, among other things, "referral fees" and the "share" of attorneys' fees owed by Milberg Weiss to these intermediaries. Nonetheless, BERSHAD understood that such payments represented monies that Milberg Weiss owed to Cooperman, were made to satisfy Milberg Weiss's payment obligation to Cooperman, and would be used for Cooperman's benefit or at his direction.

### Secret Payment Arrangement With Howard Vogel

25. BERSHAD and Partner E, on behalf of Milberg Weiss, established a secret payment arrangement with Howard Vogel, pursuant to which Milberg Weiss would pay Vogel a percentage of the attorneys' fees that Milberg Weiss obtained in Vogel's cases, as described in paragraph 6 above (except that Vogel's percentage of Milberg Weiss's attorneys' fees was sometimes greater than 10%). BERSHAD discussed Vogel's payment arrangement with other of the Conspiring Partners.

26. Initially, Partner E was Vogel's primary contact at Milberg Weiss for initiating new Class Actions and arranging for Vogel's payments. After Partner E left Milberg Weiss at the end of 1999, the maintenance of the relationship with Vogel was taken over by Schulman.

27. Vogel, certain of his relatives, and the Howard Vogel

-12-

Retirement Plan served as named plaintiffs for Milberg Weiss in numerous other Class Actions.  To satisfy Milberg Weiss's payment obligation to Vogel on these cases, Schulman and Partner E caused Milberg Weiss checks to be written to intermediary attorneys and their associated law firms selected by Vogel, namely Vogel Intermediary A and Vogel Intermediary B.  Schulman and Partner E caused these payments to be documented and falsely described as, among other things, "referral fees" and the "share" of attorneys' fees that Milberg Weiss owed to these intermediaries. Nonetheless, BERSHAD understood that any payments to Vogel intermediaries represented monies that Milberg Weiss owed to Vogel, were made to satisfy Milberg Weiss's payment obligation to Vogel, and would be used for Vogel's benefit or at his direction.

28.  Around the time of the conclusion of the <u>Oxford Health</u> class action in 2003, Schulman told BERSHAD that Vogel wanted to be paid millions of dollars for having the Howard Vogel Retirement Plan serve as a named plaintiff in that case.  BERSHAD discussed with Partner A and Schulman that Vogel's demands were too high.

29.  Because of the ongoing grand jury investigation into Milberg Weiss's payment arrangements with named plaintiffs, BERSHAD did not want to deal with Vogel on the <u>Oxford Health</u> secret payment.

30.  Based on his contemporaneous discussions with Partner A and Schulman, BERSHAD knows the following:

-13-

(a)   Schulman discussed Vogel's payment demands on Oxford Health with Partner A.

(b)   Partner A told Schulman that he did not want to talk directly to Vogel, and said Vogel should get a lawyer.

(c)   Schulman relayed this information to Vogel, who arranged for Vogel Intermediary A, a lawyer in Denver, Colorado, to negotiate the matter on Vogel's behalf.

(d)   Partner A and Vogel Intermediary A met in New York to negotiate the amount of payment for Vogel on Oxford Health.

31.   The payment Milberg Weiss made to Vogel on Oxford Health was approximately $1.1 million.  Although it was paid by Milberg Weiss check issued to Vogel Intermediary A in December 2003, at all times BERSHAD understood that the payment was made for the benefit of Vogel, in satisfaction of Milberg Weiss's obligation to Vogel for having the Howard Vogel Retirement Plan serve as a named plaintiff in Oxford Health.

Overt Acts

32.   In furtherance of the conspiracy described above, BERSHAD and other members of the conspiracy committed and caused to be committed the following acts, among others:

(a)   On or about December 13, 1999, in the Xerox class action, brought by Milberg Weiss in the United States District Court for the District of Connecticut, in which Lazar was a named plaintiff, Lazar falsely certified, under penalty of perjury, that he would "not accept any payment for serving as a

-14-

representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

(b)  On or about November 6, 1996, in the Individual class action, brought by Milberg Weiss in the United States District Court for the District of Massachusetts, in which Cooperman was a named plaintiff, Cooperman falsely certified, under penalty of perjury, that he would "not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

(c)  On or about April 9, 2003, in the CIT Group class action, brought by Milberg Weiss in United States District Court for the Southern District of New York, in which Vogel was a named plaintiff, Vogel falsely certified, under penalty of perjury, that Vogel would "not accept any payment for serving as a representative party of behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 05-587(B)-JFW |
| | ) | |
| Plaintiff, | ) | **F I R S T** |
| | ) | **S U P E R S E D I N G** |
| v. | ) | **I N F O R M A T I O N** |
| | ) | |
| DAVID J. BERSHAD, | ) | [18 U.S.C. § 371: Conspiracy] |
| | ) | |
| Defendant. | ) | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 371]

[Conspiracy]

1.    Beginning on a date unknown but at least as early as in or about 1981, and continuing through at least in or about 2005, within the Central District of California and elsewhere, defendant DAVID J. BERSHAD, together with the law firm Milberg Weiss & Bershad LLP, formerly known as "Milberg Weiss Bershad & Schulman LLP," "Milberg Weiss Bershad Hynes & Lerach LLP," and "Milberg Weiss Bershad Specthrie & Lerach" ("Milberg Weiss"); Steven G. Schulman; other partners in Milberg Weiss including those referred to as Partner A, Partner B, and Partner E;

DAA:RER:RJM

1  Seymour M. Lazar; Howard J. Vogel; Steven G. Cooperman; and other

2  persons known and unknown to the United States Attorney,

3  knowingly combined, conspired, and agreed to commit the following

4  offenses against the United States:

5          (a)  to commit obstruction of justice by corruptly

6  influencing, obstructing, and impeding, and endeavoring to

7  influence, obstruct, and impede, the due administration of

8  justice in lawsuits filed and litigated in federal courts, in

9  violation of Title 18, United States Code, Section 1503; and

10         (b)  to make false material declarations under oath in

11  proceedings before and ancillary to courts of the United States,

12  in connection with lawsuits filed and litigated in federal

13  courts, in violation of Title 18, United States Code,

14  Section 1623(a).

15      2.   In furtherance of the conspiracy and to accomplish its

16  objects, defendant BERSHAD, together with Milberg Weiss,

17  Schulman, Partner A, Partner B, Partner E, Lazar, Cooperman,

18  Vogel, and others committed and caused others to commit the

19  following overt acts, among others:

20         (a)  On or about December 13, 1999, in <u>Helene Giarputo</u>

21  <u>and Seymour Lazar v. Xerox Corp. et al.</u>, 99-CV-2374 (United

22  States District Court, District of Connecticut), in which Lazar

23  was a named plaintiff, Lazar falsely certified, under penalty of

24  perjury, that he would "not accept any payment for serving as a

25  representative party on behalf of a class beyond plaintiff's pro

26  rata share of any recovery, except such reasonable costs and

27  expenses (including lost wages) directly relating to the

28  representation of the Class as ordered or approved by the Court."

     (b)  On or about November 6, 1996, in <u>Steven Cooperman</u> <u>v. Individual, Inc. et al.</u>, 96-CV-12272 (United States District Court, District of Massachusetts), in which Cooperman was a named plaintiff, Cooperman falsely certified, under penalty of perjury, that he would "not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

     (c)  On or about April 9, 2003, in <u>Howard Vogel v. CIT</u> <u>Group Inc., et al.</u>, 93-CV-2471-JES (United States District Court, Southern District of New York), in which Vogel was a named plaintiff, Vogel falsely certified, under penalty of perjury, that Vogel would "not accept any payment for serving as a representative party of behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court."

GEORGE S. CARDONA
United States Attorney

THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division

DOUGLAS A. AXEL
Assistant United States Attorney
Deputy Chief, Major Frauds Section

RICHARD E. ROBINSON
ROBERT J. McGAHAN
Assistant United States Attorneys
Major Frauds Section

3